## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                        )
UNITED STATES OF AMERICA ex rel.        )
TODD LANGER, et al.,                    )
                                        )
            Plaintiff-Relator,          )
                                        )        Civil Action
v.                                      )        No. 21-11293
                                        )
ZIMMER BIOMET HOLDINGS, INC.,           )
                                        )
                    Defendant.          )
_____)
```

### MEMORANDUM AND ORDER

August 2, 2024

Saris, D.J.

### INTRODUCTION

In this qui tam action, Plaintiff-Relator Todd Langer ("Relator") alleges that his former employer, Defendant Zimmer Biomet Holdings, Inc. ("Zimmer"), adopted compensation arrangements with independent contractors that constitute kickbacks in violation of the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), which in turn is a violation of the False Claims Act ("FCA"), 31 U.S.C. § 3729, and analogous state laws. Specifically, in 2015 Zimmer converted its orthopedic medical device sales representatives from employees to independent contractors, compensating them with commissions based on the volume or value of their sales.

1

Zimmer now moves to dismiss all of Relator's claims by raising two primary challenges. First, it argues that Relator did not plead with sufficient detail or particularity to state a claim under the Anti-Kickback Statute. Second, it contends that Relator's allegations were disclosed previously in the public domain and therefore are barred. After hearing, the Court **DENIES** Zimmer's motion to dismiss (Dkt. 36).

**BACKGROUND**

The following facts are taken from Relator's amended complaint (Dkt. 33) and are accepted as true for purposes of the motion to dismiss.

## I.   **Zimmer's Sales Force**

Defendant Zimmer Biomet Holdings, Inc. is a publicly traded company based in Indiana that manufactures and markets various orthopedic, medical, and surgical products. Its customers include "orthopedic surgeons, neurosurgeons, oral surgeons, and other specialists, dentists, hospitals, stocking distributors, healthcare dealers and, in their capacity as agents, healthcare purchasing organizations or buying groups." Dkt. 33 at 5. Zimmer's orthopedic devices are implanted in patients covered by government healthcare programs, such as Medicare and Medicaid.

Zimmer's sales force operates nationwide. Teams of sales representatives ("sales reps") are assigned to territories where

they promote medical devices to identified customers. Zimmer's sales reps are responsible for cultivating close relationships with surgeons and facilities in their territories. In the process, they gain access to facilities, receive credentials, stock facilities with medical devices, attend surgeries, and drive business development activities, including scheduling meals with surgeons and their staff. Building strong relationships with medical professionals places sales reps "in a position to influence providers['] medical device selection and purchases." Dkt. 33 at 17. After attending surgery, Zimmer's sales reps submit invoices to the facilities. The facilities in turn pay Zimmer and then seek reimbursement from payors, including government health programs.

Plaintiff-Relator Todd Langer is a resident of Colorado who previously worked as a senior sales associate for Zimmer's subsidiaries from 2006 to 2016. He worked as a full-time, regular W-2 employee for Zimmer, specializing in the sale of orthopedic medical devices. He received intensive training and earned a sales-based commission. In 2015, Relator alone made more than $3 million in sales, on top of co-managing a team that made over $13 million in sales. He estimates that about 75% of the business he conducted for the company involved government payors.

## II. **Relator's Kickback Allegations**

Relator's complaint describes certain events starting in 2015 that allegedly demonstrate that Zimmer implemented an independent

3

contractor arrangement for its sales reps in order to increase sales of medical devices in violation of the Anti-Kickback Statute. In June 2015, Zimmer Holdings, Inc. acquired Biomet, Inc., which resulted in a merged company called Zimmer Biomet Holdings, Inc. Prior to the acquisition, Zimmer Holdings, Inc.'s orthopedic sales reps worked as W-2 employees, in contrast to Biomet, Inc.'s sales reps, who worked as independent contractors. After the acquisition, the newly merged company adopted the independent contractor model for all of its sales reps and memorialized this arrangement in a "Sales Associate Agreement." The agreement stated that sales reps were no longer company employees or agents -- instead, they were converted to independent contractors who were paid solely in commissions "tied strictly to (and in direct proportion with) the volume and value of sales." Dkt. 33 at 24. Bonuses were similarly structured to be contingent on growth of a sales rep's "Average Daily Sales." Orthopedic sales reps who rejected this new arrangement risked termination.

The restructuring allowed sales reps, working as independent contractors, to employ anyone to work for them, including spouses or children with no training or technical expertise. It also divided the sales force into smaller groups of sales reps that Zimmer had less control over. Following the acquisition, Relator heard from former colleagues that Zimmer began applying pressure on sales reps to increase orthopedic device sales. For example,

Relator's former colleague Bob Haldeman reported in May 2022 that Zimmer had imposed a 150% growth quota, which would require him to increase his sales. Zimmer imposed these higher sales quotas to increase profits and influence providers' decisions to use Zimmer's medical devices in procedures covered by government healthcare programs.

### III. **Relator's Warnings**

Relator's complaint also alleges that Zimmer knew that its independent contractor arrangement violated the AKS because Relator attempted to warn the company several times. In November 2015, Relator raised his concerns about the new independent contractor arrangement with his team leader, Devin Kendall, who instructed him "not to talk about his concerns with anyone else." Dkt. 33 at 26. Around the same time, Relator brought up the risks of violating the AKS to the Head of Sales, Rob Delp, who dismissed Relator's concerns by pointing to Uber's similar use of independent contractors. On November 24, Zimmer sent Relator a letter stating that his refusal to accept the independent contractor arrangement was tantamount to a resignation. Relator immediately communicated that he had not resigned. The following month, Relator complained to the Vice President of Human Resources, Robert Abel, about being forced to switch to an independent contractor role. And a month later, Relator reached out to Care of Compliance Officer Nathan Hwang, expressing concern that the new

structure "could compromise the legality" of "sales, particularly with respect to sales of products that would be reimbursed by government payors," but Hwang was reassigned to another role shortly thereafter. Id. at 27. Zimmer officially terminated Relator in 2016.

## IV. **Procedural History**

On May 25, 2021, Relator voluntarily disclosed his information regarding Zimmer's actions to the United States Attorney's Office. Relator subsequently filed this qui tam action in August 2021 on behalf of the United States, twenty-six states, and the District of Columbia. See Dkt. 1.[1] Relator amended his complaint, which Zimmer then moved to dismiss on the grounds that: (1) Relator's complaint fails to state a claim for violation of the AKS and (2) Relator's complaint is precluded by the public disclosure bar. See Dkts. 33, 36. The United States declined to intervene in this action, but attended the motion to dismiss hearing and submitted a notice of supplemental authority identifying caselaw in which the use of commission-based

---

[1] Relator asserts false claims violations in the following states: California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Indiana, Iowa, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington. Relator also asserts a false claims violation under District of Columbia law. Relator concedes that its claim under Maryland law cannot proceed since the Maryland state government declined to intervene. Dkt. 56 at 26 n.11.

independent contractors was held to violate the AKS. See Dkt. 71. Advanced Medical Technology Association filed an amicus brief supporting Zimmer's motion to dismiss, arguing that use of independent sales agents is widespread in the medical device industry and does not constitute a per se violation of the AKS. See Dkt. 62.

### LEGAL STANDARD

To survive a motion to dismiss, a complaint must allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the court] to draw on [its] judicial experience and common sense." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (cleaned up) (quoting Iqbal, 556 U.S. at 679).

Rule 9(b) applies to claims under the False Claims Act. See Lawton ex rel. United States v. Takeda Pharm. Co., 842 F.3d 125, 130 (1st Cir. 2016). Under Rule 9(b), allegations of fraud are subject to a heightened pleading standard. To survive a motion to

dismiss, a complaint alleging fraud must "state with particularity the circumstances constituting fraud," although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## DISCUSSION

### I.   The Anti-Kickback Statute

The False Claims Act imposes civil liability on any person who A) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; B) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; or C) "conspires to commit a violation of" the FCA. 31 U.S.C. §§ 3729(a)(1)(A)–(C). The term "knowing" means that a person "has actual knowledge of the information" or acts in "deliberate ignorance" or "reckless disregard of the truth or falsity of the information." Id. § 3729(b)(1)(A).

The AKS criminalizes "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce" him:

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or
> recommend purchasing, leasing, or ordering any good,
> facility, service, or item for which payment may be made
> in whole or in part under a Federal health care program
> . . . .

42 U.S.C. § 1320a-7b(b)(2). "[T]he heartland of what the AKS is intended to prevent [is] the use of payments to improperly influence decisions on the provision of health care that lead to claims for payment to federal health care programs," such as Medicare or Medicaid. See Guilfoile v. Shields, 913 F.3d 178, 192-93 (1st Cir. 2019). An AKS violation "that results in a federal health care payment is a per se false claim under the FCA." Id. at 190 (quoting United States ex rel. Lutz v. United States, 853 F.3d 131, 135 (4th Cir. 2017)). Here, Relator's claim against Zimmer is a civil FCA claim predicated on alleged violations of the AKS.

The AKS includes statutory safe harbors for certain payments or business practices that are not treated as offenses under the statute. 42 U.S.C. § 1320a-7b(b)(3); see also 42 C.F.R. § 1001.952. One of these exceptions, the so-called "employee safe harbor," exempts from AKS liability "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B); see also 42 C.F.R. § 1001.952(i). The rationale behind the employee safe harbor is the reduced likelihood of program abuse because of the greater control that employers exercise over their employees. See Medicare

and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35981 (July 29, 1991) (codified at 42 C.F.R. pt. 1001) ("We are confident that the employer-employee relationship is unlikely to be abusive, in part because the employer is generally fully liable for the actions of its employees and is therefore more motivated to supervise and control them.").

The Department of Health and Human Services expressly declined to extend the employee safe harbor to cover independent contractors because of "the existence of widespread abusive practices by salespersons who are independent contractors and, therefore, who are not under appropriate supervision and control." Id. In an advisory opinion published in 1998, the Office of the Inspector General for the Department of Health and Human Services ("OIG") outlined six suspect characteristics of independent contractor relationships that "appear to be associated with an increased potential for program abuse, particularly overutilization and excessive program costs." OIG Advisory Opinion No. 98-10, 1998 WL 35287765, at *3 (Aug. 31, 1998). These characteristics include:

> • compensation based on percentage of sales;
> • direct billing of a Federal health care program by the Seller for the item or service sold by the sales agent;
> • direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program;
> • direct contact between the sales agent and Federal health care program beneficiaries;

• use of sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients; or
• marketing of items or services that are separately reimbursable by a Federal health care program (e.g., items or services not bundled with other items or services covered by a DRG payment), whether on the basis of charges or costs.

Id. at *3-*4. In 2003, the OIG published another list of six similar factors that it suggested pharmaceutical and medical device manufacturers "carefully review" when evaluating arrangements falling outside of the employee safe harbor. The list of factors included:

• The amount of compensation;
• The identity of the sales agent engaged in the marketing or promotional activity (e.g., is the agent a "white coat" marketer or otherwise in a position of exceptional influence);
• The sales agent's relationship with his or her audience;
• The nature of the marketing or promotional activity;
• The item or service being promoted or marketed; and
• The composition of the target audience.

OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23739 (May 5, 2003) ("OIG May 2003 Guidance"). The OIG states that these lists of factors are meant to be "illustrative, not exhaustive, and the absence of any of these factors [] does not mean that a sales arrangement is permissible" under the AKS. OIG Advisory Opinion No. 99-3, 1999 WL 34984727, at *7 (Mar. 16, 1999). These OIG advisory opinions, which set forth multiple, broadly worded factors, are fact-specific and not meant to be relied on by any person other than the requestor. However,

the OIG itself "recognizes that stakeholders often look to published advisory opinions to understand OIG's views of particular arrangements and that advisory opinions may inform a party's review of a potential business arrangement, including identifying risks and potential application of safe harbors." Dkt. 69-1 at 85 (OIG General Compliance Program Guidance from November 2023).

## II.  Sufficiency of Kickback Allegations

Zimmer argues that Relator's theory of the AKS violation "is wrong from the outset because he assumes that any arrangement not falling within one of the articulated safe harbors is a *per se* violation." Dkt. 37 at 22. Advanced Medical Technology Association also submitted an amicus brief expanding on the same argument. See Dkt. 62 at 1 ("[A]ny finding that the use of independent sales agents is a *per se* AKS violation would significantly and negatively impact the medical device industry by, *inter alia*, chilling medical innovation and restricting patients' access to critical and often life-saving health care."). But Relator does not argue –- and the Court does not hold –- that an independent contractor arrangement per se violates the AKS. See Dkt. 67 at 4 (Relator stating that it "does not argue that Defendant violates the AKS simply because it lost the protection of the AKS's safe harbor"). Although independent contractor arrangements are not per se violations, the AKS is quite broad. In United States v. Mallory, the Fourth Circuit

rejected the argument that commissions to salespeople can never constitute kickbacks. 988 F.3d 730, 738 (4th Cir. 2021), <u>cert. denied sub nom.</u>, <u>Dent. v. United States</u>, 142 S. Ct. 485 (2021). Rather, it held that the AKS "expressly prohibits individuals from receiving renumeration in exchange for 'arranging for or recommending purchasing' healthcare services." <u>Id.</u> (quoting 42 U.S.C. §§ 1320a-7b(b)(1)(B), (b)(2)(B)). This includes "sales representatives who are compensated for recommending a healthcare service . . . to physicians." <u>Id.</u>; <u>see also</u> <u>United States ex rel. Nicholson v. MedCom Carolinas, Inc.</u>, 42 F.4th 185, 194 (4th Cir. 2022) (referring to the statute's "ominous breadth").

Zimmer contends that Relator has failed to state a plausible AKS claim because he does not allege specific facts that speak to the suspect characteristics outlined by the OIG (e.g., amount of compensation, identity of sales agent, sales agent's relationship with audience). No court has held that a relator must allege facts to support these "suspect" factors to state a claim under the AKS. Given the breadth of the AKS and the characteristics of the independent contractor arrangement alleged here (e.g., receiving sales-based commissions, working closely with surgeons and attending surgeries), the Court concludes that Relator has alleged a plausible AKS claim. <u>See</u> <u>United States ex rel. Omni Healthcare, Inc v. MD Spine Sols. LLC</u>, No. 18-12558, Dkt. 232, slip op. at 11-12 (D. Mass. Jan. 22, 2024) (finding plausible claim that

13

independent contractor service agreements violated the AKS).

Zimmer also challenges the sufficiency of Relator's pleading with respect to the "knowing and willful" element of the AKS. To establish a knowing and willful violation, Relator's complaint must allege that Zimmer acted with knowledge that its conduct was unlawful. See Bay State Ambulance and Hosp. Rental Serv., Inc., 874 F.2d 20, 33 (1st Cir. 1989); see also United States ex rel. Hart v. McKesson Corp., 96 F.4th 145, 157 (2d Cir. 2024) (holding that defendant must act with knowledge that his conduct was unlawful), petition for cert. docketed, No. 23-1293 (U.S. June 11, 2024). Pleading a plausible case of knowledge and willfulness is a hurdle in this AKS context involving independent contractor arrangements. The multiple factors listed in OIG advisory opinions are not binding and not particularly helpful in clarifying when the government will find that an independent contract arrangement violates the AKS -- and when it will not.

Here, however, Zimmer was on notice that creating a commission structure was risky business. It was familiar with the risk of violating the AKS from a 1999 litigation involving its predecessor company, Zimmer, Inc. In that case, Zimmer, Inc. sought a declaratory judgment that a similar agreement with an independent contractor, Nu Tech Medical, Inc., violated the AKS. See Zimmer, Inc. v. Nu Tech Med., Inc., 54 F. Supp. 2d 850, 853 (N.D. Ind. 1999). To bolster its position, Zimmer, Inc. had requested an

14

advisory opinion from the OIG, which concluded that "[p]ercentage compensation arrangements are potentially abusive . . . because they provide financial incentives that may encourage overutilization of items and services and may increase program costs." Id. at 855 (second alteration in original). The court held that Zimmer, Inc.'s agreement with Nu Tech Medical was in violation of the AKS. Id. at 863–64. Relator, therefore, makes a plausible argument that "Zimmer officials knew that [their independent contractor] arrangement was illegal from their previous litigation." Dkt. 33 at 31. Moreover, Relator expressed his concerns about potential AKS violations to his supervisors and Zimmer officials several times before he was terminated by the company. See id. at 25-27. Accordingly, Relator has plausibly alleged that Zimmer acted knowingly and willfully when it purportedly violated the AKS.[2]

### III. **Public Disclosure Bar**

Although Relator has sufficiently pled an AKS-predicated FCA

---

[2] In a footnote, Zimmer also moves the Court to dismiss Count III (Conspiracy to Commit Violations of the False Claims Act under 31 U.S.C. § 3729(a)(1)(C)) because Zimmer "cannot conspire with its own sales reps." Dkt. 37 at 22 n.5. This issue is not well developed. Courts have held that "companies cannot conspire with their employees or agents in the FCA context." United States ex rel. Hagerty v. Cyberonics, Inc., 95 F. Supp. 3d 240, 269 (D. Mass. 2015) (citing cases), aff'd sub nom., Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26 (1st Cir. 2016). To the extent Zimmer's sales reps are not officers or employees and can plausibly be considered separate economic actors, the Court **DENIES** the motion to dismiss Count III.

claim, he must also overcome the public disclosure bar. The public disclosure bar provides that courts "shall dismiss" FCA claims "if substantially the same allegations or transactions" were publicly disclosed "(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent" was a party; "(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media, unless the action" was "brought by the Attorney General or the person bringing the action" was "an original source of the information." 31 U.S.C. § 3730(e)(4)(A).

More specifically, a lawsuit is precluded by the public disclosure bar when "(1) there has been a prior, public disclosure of fraud, (2) that prior disclosure of fraud emanated from a source specified in the statute's public disclosure provision, and (3) the relator's qui tam action is 'based upon' that prior disclosure of fraud." United States ex rel. Banigan v. PharMerica, Inc., 950 F.3d 134, 142-43 (1st Cir. 2020) (cleaned up) (quoting United States ex rel. Poteet v. Bahler Med., Inc., 619 F.3d 104, 109 (1st Cir. 2010)). If the answers to these first three inquiries are in the affirmative, the Court then considers whether the Relator falls within the "original source" exception. The purpose of the public disclosure bar is to preclude "actions in which a relator, instead of plowing new ground, attempts to free-ride by merely repastinating previously disclosed badges of fraud." United

16

States ex rel. Ondis v. City of Woonsocket, 587 F.3d 49, 53 (1st Cir. 2009). Whistleblowers are encouraged to disclose fraud the government might not have discovered, but when the material elements of the fraudulent conduct enter the public domain, they obviate the need for relators. Id. at 58.

Invoking the public disclosure bar, Zimmer argues that the essential elements of Relator's AKS-predicated FCA claim had been revealed in various public sources before Relator communicated his information to the government on May 25, 2021. Relator responds by arguing that the public disclosure bar does not apply to his claims, and alternatively, that he falls within the original source exception.

### A.   Public Sources

"[P]ublic disclosure occurs when the essential elements exposing the particular transaction as fraudulent find their way into the public domain." Ondis, 587 F.3d at 54. The facts may come from different public sources, "as long as the disclosures together lead to a plausible inference of fraud." Id. Zimmer relies on three categories of sources it contends contain public disclosures: (1) Zimmer's Form 10-K annual reports from 2004 to 2014 and from 2020; (2) news articles from 2019 and 2021 reporting on labor lawsuits involving Zimmer; and (3) OIG guidance and caselaw concerning independent contractor arrangements in the context of the AKS.

With respect to the first category, there is no dispute that Zimmer's Form 10-K annual reports are administrative reports that are one of the statutorily prescribed methods for purposes of the public disclosure bar. See United States ex rel. CKD Project, LLC v. Fresenius Med. Care Holdings, Inc., 551 F. Supp. 3d 27, 43 (E.D.N.Y. 2021). Zimmer's Form 10-K annual reports from 2004 to 2014 -- the years prior to the 2015 company merger -- disclosed that Zimmer's sales force primarily consisted of independent contractors:

> The United States sales force consists of independent sales agents, together with sales associates, sales managers and sales support personnel, the majority of which sell Company products exclusively for Zimmer. Sales agents in the United States receive a commission on product sales and are responsible for many operating decisions and costs.

Dkt. 37-3 at 4 (2004 Form 10-K Annual Report); see also id. at 3 ("The Company utilizes a network of sales associates, sales managers and support personnel, most of who[m] are employed by independent distributors and sales agencies."). Zimmer's Form 10-K annual report from 2020, filed after the merger but before Relator's communication with the government, similarly disclosed Zimmer's use of independent contractors. See Dkt. 37-2 at 24 (2020 Form 10-K Annual Report) ("We structure our relationships with independent agents and distributors in a manner that we believe results in an independent contractor relationship, not an employee relationship."). None of Zimmer's annual reports specifically

18

state whether orthopedic medical devices sales reps are independent contractors.

The second category of public sources consists of news articles, which are another statutorily prescribed method of disclosure. See Poteet, 619 F.3d at 109. Zimmer cites to a 2019 article from Bloomberg Law News reporting on a labor dispute between Zimmer and a putative class of medical device sales reps. See Dkt. 37-14. In describing the named plaintiff, "James Karl, a San Francisco-based orthopedic device sales representative," the article states:

> Karl was hired by Zimmer US as a sales representative, described his work as sales-driven, had significant autonomy over his schedule, and earned a high salary solely through sales-based commissions, the court said Oct. 25. While Karl consulted surgeons on individual cases and often assisted during medical device implantation, the evidence suggests he did so to sell more products, the court said.

Id. at 2. The other two news articles from 2021 cited by Zimmer contain similar information but were published after Relator's disclosure to the government.

The third category of public sources that Zimmer relies on includes OIG guidance and caselaw supporting Zimmer's contention that "the government was well aware of the common industry practice among pharmaceutical and medical device manufacturers of using sales representatives classified as independent contractors." Dkt. 37 at 17. Zimmer cites to the 2003 OIG Compliance Program

Guidance in which the OIG urges manufacturers to "carefully review" independent contractor arrangements for fraud and abuse. See OIG May 2003 Guidance at 23739. Zimmer also references lawsuits challenging independent contractor arrangements, citing in particular United States v. Mallory, a case in which, as described above, the Fourth Circuit affirmed a jury verdict finding that an agreement between a blood testing lab and an independent contractor violated the AKS. 988 F.3d at 735-38. Zimmer contends that the OIG guidance and the Mallory decision "highlight the government's concern that the industry-wide employment-structuring practice for sales reps can give rise to abuse." Dkt. 60 at 6.

However, as Relator points out, these "generic and inapplicable" documents do not mention or identify Zimmer or Zimmer's practices at all. Dkt. 56 at 17. Because these sources do not directly pertain to Zimmer, without more, these sources do not make the public disclosure bar applicable to Relator's suit. See Cooper v. Blue Cross & Blue Shield of Fla., Inc., 19 F.3d 562, 566 (11th Cir. 1994) (finding "allegations of widespread [] fraud made in sources in which [defendant] was not specifically named or otherwise directly identified" was "insufficient to trigger" the application of the public disclosure bar).

**B.  Substantial Similarity**

As noted above, the public disclosure bar forecloses Relator's action "if substantially the same allegations or

transactions as alleged in the action . . . were publicly disclosed" in one of the statutorily prescribed methods. 31 U.S.C. § 3730(e)(4)(A). The Court examines "whether the allegations or transactions identified in relators' complaint have already been publicly disclosed" and "whether the allegations or transactions on which the relators' suit rests are substantially the same as the publicly disclosed allegations or transactions." United States ex rel. Winkelman v. CVS Caremark Corp., 827 F.3d 201, 208 (1st Cir. 2016). Ultimately, the disclosed conduct does not have to be defined or labeled as fraudulent, but the disclosure should put the government on notice of potential fraud. Id. at 208–09. "In evaluating substantial similarity, an inquiring court should bear in mind the core purpose of the FCA: to encourage suits by individuals with valuable knowledge of fraud unknown to the government." Id. at 210.

Taking into consideration all of Zimmer's cited public disclosures, the Court finds that the essential elements of Relator's claims were previously disclosed and are substantially the same as information contained in public sources. The main allegation in Relator's complaint is that Zimmer "knowingly and willfully converted its business relationship with its orthopedic medical device sales representatives" from employees to independent contractors, "compensating them on a commission-only basis (based on the value or volume of their sales)," in violation

of the AKS. Dkt. 33 at 1–2. However, before Relator filed suit,
Zimmer's Form 10-K annual reports and news articles had already
disclosed that Zimmer's orthopedic medical device sales reps
worked as independent contractors and received sales-based
commissions. Moreover, the 2019 Bloomberg article reported that
Zimmer's sales reps "consulted surgeons on individual cases and
often assisted during medical device implantation" to sell more
devices. Dkt. 37-14 at 2. Thus, the crux of the independent
contractor arrangement allegation was publicly disclosed by 2019
and could have led to a plausible inference of fraud before Relator
came onto the scene in 2021. See Poteet, 619 F.3d at 115 (finding
enough to trigger public disclosure bar where relator's allegation
and prior disclosure "ultimately target[] the same fraudulent
scheme").

        In an attempt to distinguish the allegations raised in his
complaint and the allegations disclosed in the public sources,
Relator maintains that his complaint includes crucial details not
found in the public domain, such as information about "Zimmer
Biomet's 2015 workforce restructuring, the provisions of the
independent contractor agreement, the mechanics of the volume-
based commission or anything about government payors or the sales
reps' involvement with procedures reimbursed by government
payors." Dkt. 56 at 21. However, providing "greater detail about
the underlying conduct" or "add[ing] some color to the allegation"

is not enough to avoid the public disclosure bar, especially where the complaint targets the same potentially fraudulent conduct disclosed in the public sources -- here, Zimmer's use of independent contractors compensated by sales-based commissions. See Poteet, 619 F.3d at 115; Winkelman, 827 F.3d at 210. The Court concludes that the essential elements of Relator's complaint were publicly disclosed, thus triggering the public disclosure bar.

### C.   Original Source Exception

Although the essential elements of Relator's claims were publicly disclosed, an "escape hatch" nonetheless exists if Relator can prove that he is an original source. See Ondis, 587 F.3d at 58–59. The statute provides two definitions for original source: an individual who either (1) "prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based," or (2) "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). Relator does not satisfy the first definition of original source because he voluntarily disclosed his information to the government only *after* the publication of Zimmer's Form 10-K annual reports and the 2019 Bloomberg article.

Therefore, the Court focuses on the second definition of original source.

In his complaint, Relator demonstrates that he has knowledge that is independent from public disclosures. "A relator's knowledge is . . . 'independent' if her knowledge is not dependent on the public disclosure." United States ex rel. O'Keeffe v. Sverdup Corp., 131 F. Supp. 2d 87, 93 (D. Mass. 2001). Relator worked as a sales associate at Zimmer for ten years and personally observed the allegedly fraudulent conduct while he was employed there. Relator describes the close relationships that developed between orthopedic sales reps and their customers, explaining the significant amount of time sales reps spent communicating with surgeons, attending surgeries, and stocking medical devices in surgical rooms. Relator reports that sales reps would also "schedule dinners" or "set up breakfasts or luncheons at the surgeon's offices to discuss new Zimmer Biomet products or answer any questions about the products." Dkt. 33 at 17.

Relator also gained knowledge from company presentations and documents, in addition to conversations with colleagues. For example, Relator describes a November 2015 PowerPoint presentation in which Zimmer assured sales reps that working as independent contractors would afford them the "element of independence" and the ability to employ their spouses or kids as sales reps. Id. at 21 (cleaned up). Relator also lists the contents of the company's

24

Sales Associate Agreement, which included a compensation structure chart stating that Relator would receive 5% of surgical-related sales and 12% for trauma- or biologics-related sales. See id. at 24. Relator's complaint also includes figures from Zimmer's 2016 Sales Details reports, which include the percentage of commissions based on total sales. See id. at 28 (reporting, for example, a 7.3% commission from total sales in March 2016). Finally, Relator describes learning from his former colleague Bob Haldeman in 2022 that Zimmer had imposed a 150% growth quota, which meant that sales reps would have to increase their sales or risk losing their territories. See id. at 32.

Relator's allegations also materially add to information already publicly disclosed. A relator's information "materially adds" to public disclosures if it is significant, essential, or influences a person's decision-making. Winkelman, 827 F.3d at 211. As explained above, determining whether a given independent contractor arrangement violates the AKS depends on a case-by-case analysis of certain "suspect characteristics." In his complaint, Relator alleges facts that relate to several of these characteristics, including the amount of compensation sales reps receive, the amount of influence they exert over customers, and the relationships they form with surgeons and medical facilities. Relator's complaint sheds light on Zimmer's intentions to "appl[y] further pressure on independent orthopedic sales reps to increase

sales" and "induce its independent sales reps to become more effective at steering providers' decisions to implant Zimmer Biomet medical devices." Dkt. 33 at 32-33. These allegations are material because they could influence whether Zimmer's independent contractor arrangement is ultimately found to be in violation of the AKS. For the foregoing reasons, Relator proves that he is an original source, and his claims therefore survive the public disclosure bar.

### **ORDER**

For the foregoing reasons, the Court **DENIES** Defendant's motion to dismiss (Dkt. 36).


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge