# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *et al.*, *ex rel.* TODD LANGER, *et al.*, | ) ) ) | |
| Plaintiff-Relator, | ) ) | Civil Action No.: 1:21-cv-11293-PBS |
| v. | ) ) | JURY TRIAL DEMANDED |
| ZIMMER BIOMET HOLDINGS, INC., | ) ) | |
| Defendant. | ) ) | |

## THIRD AMENDED COMPLAINT

1.     Plaintiff-Relator Todd Langer ("Mr. Langer" or "Relator") brings this action on behalf of himself and the United States of America under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* as amended, and the state governments of California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington (collectively, the "States") under the *qui tam* statutes of their respective states against Defendant Zimmer Biomet Holdings, Inc. ("Zimmer Biomet" or "Defendant"), alleging as follows:

## PRELIMINARY STATEMENT

2.     This lawsuit shines a light on an illegal scheme wherein Defendant Zimmer Biomet knowingly and willfully converted its business relationship with its orthopedic medical device sales representatives ("orthopedic sales reps") from a *bona fide* employment relationship with W2 employees based on applicable legal standards into an independent contractor arrangement with

1099 workers, compensating them on a commission-only basis (based on the value or volume of their sales) to save the company money and reduce the company's legal exposure. Defendant did this despite knowing plainly that this arrangement and compensation scheme qualify as illegal remuneration under the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, *eq seq.*, provided in whole or in part with the intent to induce referrals. This in turn caused false claims to be submitted to the Federal Government and State Governments.

3.      Defendant's illegal compensation scheme arose following Zimmer Holdings, Inc. ("Zimmer") acquisition of Biomet, Inc. ("Biomet") in or around 2016.

4.      Defendant's independent-contractor arrangement increased the risk of fraud and abuse to government's health care programs because the express purpose of every action taken by the independent sales force is to create more sales through contact with physicians and facilities.

5.      In converting its orthopedic sales workforce into contractor arrangements, Defendant relinquished ultimate control over sales practices to third-party independent contractors, and it contractually absolved itself of any responsibility for such contractors' conduct. It then ensured orthopedic sales reps were motivated and incentivized to increase sales above all else.

6.      It did so by paying orthopedic sales reps with a commissions-only arrangement, tied directly to the volume and value of sales.

7.      Defendant knew this change violated the Anti-Kickback Statute because Zimmer fought such arrangements more than a decade prior and because the Relator directly challenged the decision to change this business relationship in real time, specifically invoking concerns about the Anti-Kickback Statute. Yet, the company restructured its orthopedic sales force anyway.

8.      By relying on independent contractors for orthopedic medical device sales and by paying contractors commissions only, Defendant has been knowingly and willfully violating the

Anti-Kickback Statute, the False Claims Act, relevant state law equivalents, and government regulations regarding the sale of such equipment. These violations by Defendant apply to nationwide sales of orthopedic medical devices and are continuing and ongoing.

9.      Accordingly, Mr. Langer files this action to recover penalties and damages on behalf of himself, the Federal Government, and the States' Governments.

## JURISDICTION AND VENUE

10.      This action arises under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as well as state *qui tam* actions under Cal. Gov't Code §§ 12650 *et seq.*; Colo. Rev. Stat. §§ 25.4-4-303.4 *et seq.*; Conn. Gen. Stat. §§ 17b-301a--17b-301p (2010 supplement); Del. Code Ann. Tit.6. §§ 1201 *et seq.*; D.C. Code §§ 2-381.01 *et seq.*; Fla. Stat. Ann. § 68.081, *et seq.*; Haw. Rev. Stat. Ann. §§ 661-21 *et seq.*; 740 Ill. Comp. Stat. Ann. 175/1 *et seq.*; Ind. Code §§ 5-11-5.5 *et seq.*; Iowa Code § 685.1 *et seq.*; La. Rev. Stat. Ann. §§ 6:438.1 *et seq.*; Md. Code Ann. Health-Gen. §§ 2-601 *et seq.*; Md. Code Ann. Gen. Prov. §§ 8-101 *et seq.*; Mass. Ann. Laws ch.12, §§ 5 *et seq.*; Mich. Comp. Laws. Serv. §§ 400.601 *et seq.*; Minn. Stat. §§ 15C.01 *et seq.*; Mont. Code Ann. §§ 17-8-401 *et seq.*; Nev. Rev. Stat. Ann. §§ 357.010 *et seq.*; N.J. Stat. Ann. §§ 2A: 32C-1 *et seq.*; N.M. Stat. Ann. §§ 27-14-1 *et seq.*; N.M. Stat. Ann. §§ 44-9-1 *et seq.*; N.Y. State Fin. Law §§ 188 *et seq.*; N.C. Gen. Stat. §§ 1-605 *et seq.*; Okla. Stat. Title 63, §§ 5053 *et seq.*; R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; Tenn. Code Ann. §§ 4-18-101 *et seq.*; Tenn. Code Ann. §§ 71-5-181 *et seq.* 1993; Tex. Hum. Res. Code Ann. §§ 36.*001 et seq.*; Va. Code Ann. §§ 8.01-216.1 *et seq.*; 32 VSA §§ 630 *et seq.*; RCW § 74.66.005 *et seq.* (collectively, the "State False Claims Acts").

11.      This Court maintains original jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

12.      Jurisdiction over claims arising under the State False Claims Acts is conferred by 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 in that the transactions and/or occurrences described,

which violate the State False Claims Acts, involve a common nucleus of facts as, and are related to, those that violate the Federal False Claims Act.

13.     Venue is proper in this jurisdiction under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 because Defendant maintains an office in this district, and regularly transacts business in this district and did so at all times relevant to this Amended Complaint, and because some of the alleged violations have occurred, and continue to occur, in this district.

## THE PARTIES

### I.     Plaintiff-Relator Todd Langer

14.     Mr. Langer is a citizen of the United States and resides in the state of Colorado and in the county of Arapahoe.

15.     Mr. Langer has experience working in medical device sales for over twenty years.

16.     Mr. Langer holds both a Bachelor of Science in Engineering (Mechanical Specialty) and a Master of Science in Engineering Systems from the Colorado School of Mines, which has provided him with relevant, technical education applicable to his work in orthopedic sales.

17.     Relevant to this action, Mr. Langer worked as an employee sales rep, also referred to as a Senior Sales Associate, for Zimmer Rocky Mountain (an "independent" distributor exclusive to Zimmer medical devices) from approximately 2006 until March 2014. In or around March 2014, Langer started working as an employee of Zimmer.

18.     Mr. Langer specialized in selling orthopedic medical devices for Defendant.

19.     Beginning in 2014, Zimmer employed Mr. Langer as a "W-2", full-time regular employee, and he was paid, supervised, and treated as a *bona fide* employee.

4

20.     There has been no prior public disclosure of these allegations as encompassed by the definition of the term "publicly disclosed" under 31 U.S.C. § 3730(e)(4)(A), as amended, or as a public disclosure is defined under the State False Claims Acts.

21.     To the extent a public disclosure may have occurred, Mr. Langer is an original source under the False Claims Act, 31 U.S.C. § 3730(e)(4)(B), and the State False Claims Acts.

22.     On May 25, 2021, Mr. Langer first voluntarily disclosed to the U.S. Government the information on which these allegations are based. The United States Attorney's Office confirmed receipt of Mr. Langer's voluntary disclosure on May 25, 2021.

23.     Mr. Langer has knowledge that is independent of and materially adds to any allegations or transactions that may have been publicly disclosed, and Mr. Langer voluntarily provided his information to the United States and each of the above listed States before filing this action under seal on August 9, 2021.

## II.     Defendant Zimmer Biomet Holdings, Inc.

24.     Defendant is a publicly traded company on the New York Stock Exchange under the symbol "ZBH," with net sales of more than $7.9 billion in 2019 according to its Annual Report. *See* Annual Report 2019 at "Financial Highlights."

25.     Defendant is based in Indiana with the address of P.O. Box 708 Warsaw, IN 45681.

26.     Defendant designs, manufactures, and markets orthopedic reconstructive products; sports medicine, biologics, extremities and trauma products; office-based technologies; spine, craniomaxillofacial and thoracic products; dental implants; and related surgical products.

27.     Defendant describes its primary customers as orthopedic surgeons, neurosurgeons, oral surgeons, and other specialists, dentists, hospitals, stocking distributors, healthcare dealers and, in their capacity as agents, healthcare purchasing organizations or buying groups. These customers range from large multinational enterprises to independent clinicians and dentists.

28.     Defendant does business throughout the United States with orthopedic sales associates nationwide, as listed on its website including those located at 141 Middlesex Turnpike, Burlington, MA 01803.

29.     In April 2014, Zimmer announced that its Board of Directors had approved an agreement for Zimmer to acquire Biomet. *See Zimmer Holdings, Inc. to Combine with Biomet, Inc. in Transaction Valued at $13.35 Billion*, Zimmer Biomet (Apr. 24, 2014).[1]

30.     In June 2015, Zimmer announced that its acquisition of Biomet was complete. *See Zimmer Completes Combination with Biomet*, Zimmer Biomet (June 24, 2015).[2]

31.     Defendant's 2019 annual report explains:

Zimmer Biomet Holdings was incorporated in Delaware in 2001. Our history dates to 1927, when Zimmer Manufacturing Company, a predecessor, was founded in Warsaw, Indiana. On August 6, 2001, we were spun off from our former parent and became an independent public company. In 2015, we acquired LVB Acquisition, Inc. ("LVB"), the parent company of Biomet, Inc. ("Biomet"), and LVB and Biomet became our wholly owned subsidiaries (sometimes hereinafter referred to as the "Biomet merger" or the "merger"). In connection with the merger, we changed our name from Zimmer Holdings, Inc. to Zimmer Biomet Holdings, Inc.

Annual Report 2019 Form 10-K Part I Item 1 Overview.

32.     By 2015, Defendant controlled all affiliates or subsidiaries that Mr. Langer worked through during his tenure with the company. Mr. Langer received his paychecks from Zimmer Holdings, Inc. starting in early 2014.

33.     The Zimmer-Biomet merger precipitated major changes in Defendant's structure, including the structure of its relationship with its orthopedic sales reps, which affected Mr. Langer and others in ways that are relevant to the allegations in this Amended Complaint.

---

[1] *Available at* https://investor.zimmerbiomet.com/news-and-events/news/2014/24-04-2014-192211031.
[2] *Available at* https://investor.zimmerbiomet.com/news-and-events/news/2015/24-06-2015-191859180.

## LEGAL BACKGROUND

### I.     The Anti-Kickback Statute

34.    The Anti-Kickback Statute arose out of congressional concern that financial inducements may corrupt referral decisions; undermine the goals of ensuring fair competition for federal funds and a market driven by quality of care rather than financial incentives; impose higher costs on federal health care programs; and divert federal funds towards goods and services that are medically unnecessary, of poor quality, or even harmful to patients.

35.    To protect federal health care programs from these harms, Congress enacted a prohibition against offering, soliciting, paying, or receiving kickbacks in any form.

36.    Specifically, the Anti-Kickback Statute makes it illegal for an individual or entity knowingly and willfully to solicit or receive any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly, or covertly, in cash or in kind—

> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(1).

37.    The Anti-Kickback Statute also makes it illegal for an individual or entity knowingly and willfully to offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly, or covertly, in cash or in kind to any person to induce such person—

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

§ 1320a-7b(b)(2).

38.     Under the Anti-Kickback statute, "remuneration" includes anything of value. *See, e.g.*, Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952-01, 35958 (Jul. 29, 1991).

39.     A person "[n]eed not have actual knowledge of [the Anti-Kickback statute] or specific intent to commit a violation of the [Anti-Kickback statute]" to be found to have violated the Act. 42 U.S.C. § 1320a-7b(b)(h).

40.     Anti-Kickback Statute violations constitute a felony punishable by fines of up to $100,000 and imprisonment for up to ten years. 42 U.S.C. § 1320a-7b(b)

41.     The Anti-Kickback Statute contains several statutory exceptions setting forth certain circumstances under which the Anti-Kickback Statute's prohibitions against remuneration do not apply. *See* 42 U.S.C. § 1320a-7b(b)(3). None of those statutory exceptions apply in the circumstances alleged here.

42.     Additionally, the United States Department of Health and Human Services Office of Inspector General has promulgated "safe harbor" regulations that identify payment practices that are not subject to the Anti-Kickback Statute because such practices are unlikely to result in fraud or abuse. *See* 42 C.F.R. § 1001.952. Safe harbor protection is afforded only to those arrangements that meet all the specific conditions set forth in the safe harbor. None of the safe harbors apply in the circumstances alleged here.

43.     One such available safe harbor protects employment agreements in a *bona fide* employment relationship. 42 U.S.C. § 1395nn(e)(2); *see also* 42 C.F.R. §§ 411.357(c), 411.354(d)(4). According to the regulations, the term "employee has the same meaning" under the Anti-Kickback Statute as the Internal Revenue Code's definition of "employee" found in 26 U.S.C.

§ 3121(d)(2). 42 C.F.R. § 1001.952(i). The Internal Revenue Code provides that an "employee" is "any individual who, under the usual common law rules applicable in determining the employer-employee relationship[] has the status of an employee." 26 U.S.C. § 3121(d)(2).

44.    The Office of Inspector General ("OIG") of the U.S. Department of Health and Human Services ("HHS") specifically rejected the idea of extending the *bona fide* employment relationship safe harbor protection to independent contractors "in part because the employer is generally fully liable for the actions of its employees and is therefore more motived to supervise and control them." *See* "Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions," 56 Fed. Reg. 35952-01 (1991).

45.    The Anti-Kickback Statute applies to all federal health care programs, including but not limited to Medicare, Medicare Advantage, Medicaid, TRICARE, CHAMPVA, and Federal Employee Health Benefits Program ("FEHBP"), 42 U.S.C. § 1320a-7b(f), and to any State health care program, as defined in 42 U.S.C. § 1320a-7(h).

46.    Compliance with the Anti-Kickback Statute is a prerequisite to payment and reimbursement by any federal or state government health care program defined in the AKS and is material to the foregoing government health programs' legal authority to pay claims or to pay any provider who submits, or is caused to submit, claims to government health care programs.

47.    Furthermore, a claim for reimbursement from a federal health care program, including but not limited to Medicare, Medicare Advantage, Medicaid, TRICARE, CHAMPVA, and FEHBP, for items or services resulting from a violation of the Anti-Kickback Statute, "constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

## II.    Federal and State-Funded Health Insurance Programs

48.    Defendant's orthopedic medical devices are implanted in patients that are covered by government health care programs.

49.    Mr. Langer estimates that approximately 75% of all the business he conducted on Defendant's behalf during his long career involved government payors.

50.    According to Mr. Langer, the majority of Defendant's cases involved patients covered by Medicare or Medicaid. This is not surprising given that patients in need of joint replacement are generally among the older population and therefore likely to be enrolled in Medicare or Medicare Advantage. Persons eligible for TRICARE and VA services make up another large group of patients in need of joint replacement according to Mr. Langer's experience.

### A.    *Medicare*

51.    Medicare is a government program primarily benefiting the elderly created by Congress in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency, which sets standards and regulations for participation in the program. Medicare Part A primarily covers medical care for patients admitted to the hospital, while Medicare Part B primarily covers doctor visits and medical care provided on an outpatient basis. Under Medicare Parts A and B, sometimes referred to as "original Medicare," the health care provider submits claims to Medicare (via the applicable regional Medicare Administrative Contractor ("MAC")) and receives reimbursement directly from Medicare.

52.    In addition, Medicare also provides benefits through Medicare Advantage plans sometimes called Medicare Part C, which are administered by private health insurance companies that receive a per member/per month capitated payment in advance from Medicare for the provision of Part A and B covered services. All Medicare Advantage (or Medicare Part C) plans

are required by statute to contract with Centers for Medicare and Medicaid Services ("CMS") in order to receive payments. 42 U.S.C. § 1395w-27(a). The Medicare Advantage plans are also subject to the Medicare program's anti-fraud provisions and the Anti-Kickback Statute. All Medicare Part C plans and their providers must also agree to comply with all state and federal regulatory requirements, including the anti-fraud provisions of the Medicare laws and the Anti-Kickback Statute as a condition of receiving payment.

53.     To participate in the Medicare program as a new enrollee, group practices must submit a Medicare Enrollment Application, Form CMS-855B. These entities must also complete Form CMS-855B to change information or to reactivate, revalidate, and/or terminate Medicare enrollment. That form requires various express undertakings, including that the enrollee will abide by the State and Federal laws, including the Anti-Kickback Statute:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855a (for institutional providers); *see also* Form CMS-855I (for Physicians and Non-Physician Practitioners). Based upon this express undertaking to comply with the Anti-Kickback Statute, every claim submitted to Medicare is necessarily an implied certification that the underlying transaction is not tainted by a violation of the Anti-Kickback Statute.

54.     Applicants further represent that they will not "knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and [] will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Form CMS-855a (for institutional providers); *see also* Form CMS-855I (for Physicians and Non-Physician Practitioners) (agreeing to abide by Federal Anti-Kickback Statute along with other federal laws).

11

55.    The Medicare program works by reimbursing health care providers for the cost of services and ancillary items at fixed rates. Reimbursements are made from the Medicare Trust Fund. Only services that were actually performed, were medically necessary for the health of the patient, and were ordered specifically by a physician, using appropriate medical judgment and acting in the best interest of the patient are reimbursable.

56.    The Medicare Trust Fund relies on certifications from suppliers of Medicare services that the services billed by the providers are medically necessary for the patient, are actually performed as billed, and are compensable by Medicare in determining eligibility for payment. Medicare and other government health care programs require that the service be physically performed and billed accurately according to CMS policies and procedure codes.

57.    In addition to the certifications provided upon enrollment, CMS requires health care providers' certifications when submitting claims for payment, certifying that they complied with all laws and regulations governing the provision of health care services, including compliance with the Anti-Kickback Statute. 42 C.F.R. § 424.516(a)(1).

58.    Specifically the form CMS-1500 requires providers to expressly certify, in part, that "the information on this form is true, accurate and complete"; that the providers have "familiarized [themselves] with all applicable laws, regulations, and program instructions"; that the claim "complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and the [Stark Law]"; and that the services provided were medically necessary.

59.    These certifications remained substantially the same during the relevant time period.

60.     These undertakings and certifications of compliance with laws, regulations, and program instructions are an absolute condition precedent to obtaining and retaining the Medicare funds paid or conditionally advanced by Medicare and are a prerequisite to continued future participation in the Medicare program.

61.     Where certifications are determined to be improper or invalid, the entity submitting improper or invalid payments is required to repay all Medicare payments previously received.

**B.**     *Medicaid*

62.     Medicaid was created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the Federal Government and those states participating in the program. Under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, federal money is distributed to the states, which in turn provide certain medical services to qualifying individuals.

63.     Individuals may be dually eligible for both the Medicare program (as primary insurer) and the Medicaid program (as secondary insurer).

64.     Although Medicaid is administered by the states, the state programs must adhere to federal guidelines. Federal statutes and regulations restrict the goods and services that the Federal Government will pay for through its funding of the state Medicaid programs.

65.     Federal Medicaid regulations require that states designate a single state agency to oversee the Medicaid program. The agency must make a plan that is consistent with Title XIX and with the regulations of the Secretary of Health and Human Services. The state plan is "a comprehensive written statement submitted by the agency describing the nature and the scope of [the state's] Medicaid program and giving assurance that it will be administered in conformity" with the applicable federal laws and regulations. 42 C.F.R. § 430.10.

66.     After the Secretary approves the plan submitted by the state, each state is reimbursed quarterly for a percentage of the expenditures associated with providing specific types of medical assistance under the plan.

67.     Similar to Medicare, Medicaid providers must complete a provider application/agreement form in which they undertake to comply with all laws, including the AKS. Medicaid providers also use the form CMS-1500, or an electronic equivalent, to submit claims for reimbursement under the Medicaid program. Specifically, related to Medicaid, the form states: "This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

68.     Like Medicare, participation in Medicaid is also conditioned on compliance with the Anti-Kickback Statute.

69.     Accordingly, if a party pays a kickback to induce the implantation of a medical device, as alleged here, the kickback renders the claimant's certification of compliance false because the claim does not comply with the Anti-Kickback Statute. The intent to induce need not be the only purpose of the scheme; it is enough if the intent to induce is one purpose.

C.     *Other Government Funded Health Insurance Programs*

70.     In addition to Medicare and Medicaid, the federal Government reimburses a portion of the cost of health care under several other federal health care programs, including but not limited to TRICARE, CHAMPVA, and FEHBP.

71.     TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the United States armed forces.

72.     Any person or provider seeking reimbursement from TRICARE must comply with TRICARE's anti-fraud and abuse provisions. 32 C.F.R. § 199.9(a)(4). Fraud and abuse include commission and kickback arrangements with independent contractors. *Id.* § 199.9(c)(12).

73.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for veterans with 100-percent service-connected disabilities and their eligible family members.

74.     FEHBP, administered by the United States Office of Personnel Management, provides health insurance for federal employees and their qualifying dependents, and retirees and their surviving spouses.

75.     Each of these federal health care programs require providers to certify compliance with the False Claims Act and the Anti-Kickback Statute and such compliance with those laws and the anti-fraud regulations of their respective programs is a condition of receiving payments or reimbursements from these programs.

## **FACTUAL ALLEGATIONS**

I.     **While Defendant's Orthopedic Sales Representatives Work Closely with Medical Facilities and Surgeons when Selling Defendant's Medical Devices, their Job Is to Drive Profits for Defendant.**

76.     Defendant sells medical devices nationwide. It divides its orthopedic salesforce into regions and then smaller units called territories. Orthopedic sales reps are assigned to a team within a territory, where they target identified surgeons and facility customers.

77.     Defendant's sales force serves to promote Defendant's products and makes every effort to do so including by helping to arrange for individual surgical patients to receive Defendant's devices and to increase sales and profits for Defendant.

78.     Orthopedic sales reps' primary job duties include building strong relationships with surgeons and facilities, who are the key account decision makers, in their territories; tracking

customer sales activities; and driving sales activities that lead to conversions and business growth within their territory.

79.    In carrying out these duties, orthopedic sales reps work closely with the surgeons and the facilities in their territories. They receive credentials from facilities. They maintain regular communication with the facility materials departments that oversee purchase orders. They communicate regularly with facilities to ensure the facilities are fully stocked with the appropriate Zimmer Biomet orthopedical medical devices prior to surgeries and to ensure that they are well informed about the timing of upcoming procedures.

80.    A significant portion of orthopedic sales reps' week is spent attending surgeries.

81.    The day of surgery, orthopedic sales reps arrive early to "check in," confirm the schedule, and change into fresh scrubs.

82.    The orthopedic sales reps typically ensure the appropriate medical devices are available for the surgery, clean, and sterilized.

83.    They also remain in the operating room to facilitate the on-label use of the appropriate medical device. The orthopedic sales reps also use this opportunity to further their relationships with the medical staff who order such devices.

84.    The orthopedic sales reps leave the operating room prior to patient arrival and typically re-enter after a sterile field is established. During surgeries, they would provide the surgeons and other medical staff with information related to installation or removal of the Zimmer Biomet products.

85.    The surgeons proceed to scrub in, confirm the surgical plan, and perform the procedure.

86.     The orthopedic sales reps present the medical devices, the surgeons confirm the devices are correct, and then the circulating nurses open the devices.

87.     After the surgery, orthopedic sales reps submit billing sheets to the materials department, and the facility generates a purchase order. The facility pays Defendant and then seeks reimbursement from payors. Providers use this documentation in part to submit claims to payors, including Medicare, Medicare Advantage plans, Medicaid, TRICARE, CHAMPVA, FEHBP, and other government health programs.

88.     Orthopedic sales reps also regularly visit and contact surgeons' offices and office staff. They also sometimes set up breakfasts or luncheons at the surgeon's offices to discuss new Zimmer Biomet products or answer any questions about the products. They also sometimes schedule dinners between certain surgeons and Zimmer Biomet leadership, when leaders visit that area.

89.     These regular interactions allow orthopedic sales reps to develop close relationships with surgeons and other medical staff. These relationships and interactions put orthopedic sales reps in a position to influence providers medical device selection and purchases.

90.     Indeed, Defendant has acknowledged that one way in which sales representatives may influence providers' decision-making is by offering discounts for medical devices. *See Karl v. Zimmer Biomet Holdings, Inc.*, No. C 18-04176 WHA, 2020 WL 4340172, at *6 (N.D. Cal. July 28, 2020).

**II.    Mr. Langer Experienced Success as an Employee, Orthopedic Sales Rep for Zimmer.**

91.     In 2006, Mr. Langer began working for Zimmer Rocky Mountain, an independent distributor of Zimmer, as an employee who received regular paychecks and withholdings.

92.     In 2008, Zimmer Rocky Mountain decided to create greater incentives for its Denver area orthopedic sales reps by forming four teams. Then, in 2009, Mr. Langer combined his

17

team with Devin Kendall's team to form Team Mile High (led by Mr. Kendall), which joined two of the four teams together covering the South and East Denver metropolitan area.

93.    The team members had a commission structure based on sales, with base salaries or base amounts earned against a commission.

94.    Importantly, all team members remained *bona fide* employees who were trained and controlled by Zimmer to ensure that accounts were serviced lawfully with the requisite expertise and professionalism. Zimmer remained liable for their conduct.

95.    During that time, orthopedic sales reps would receive a variety of training. The new orthopedic sales reps would receive training when starting with the company about Defendant's products and how to present themselves. Defendant would train the orthopedic sales reps on what types of behaviors they needed to avoid when promoting Defendant's products and what qualified as legal violations. There were also annual training courses at their national sales meetings.

96.    This training was critical because, if an orthopedic sales rep was not properly trained, then there could be significant and harmful consequences to patients. If an orthopedic sales rep supplied a surgeon with incorrect information related to insertion or removal of a medical device, there is no end to type of harm a patient may experience, including everything from revision surgeries to death.

97.    A lack of proper training could also extend the time of surgery. Typically, these types of surgeries cost between $60-100 per minute—costs of which are often reimbursed by payors, including the government.

98.    In short, at all times prior to the June 2015 merger with Biomet, Mr. Langer worked as a W-2 employee. He reported up to a Zimmer supervisor, was annually evaluated, attended

compliance trainings, and was held accountable to a company code of conduct and company policies as Zimmer remained liable during this time for his conduct as an employee.

99.     As an orthopedic sales rep, Mr. Langer sold equipment and medical devices for total joint replacements, including limb salvage, knees, hips, and upper and lower extremities. He also sold operating room capital equipment, durable medical equipment, sports medicine product lines, and human tissue.

100.    Mr. Langer specialized in "revision" cases, which involve either worn out or old joint replacements as well as replacements ordered because of a negative reaction post-surgery. This involved working with more expensive and often more advanced technology. He also was given the opportunity to open new territory for Zimmer, and he serviced accounts for more than twenty facilities.

101.    Over the decade that he was in this position and because of his success, Mr. Langer continually earned more territory and responsibility from within Zimmer.

102.    As Mr. Langer was successful in generating new business, servicing the accounts required more help. New sales required company personnel always be on call to help medical professionals using the equipment. Mr. Langer recruited such personnel from within Zimmer who were familiar with its technology. Mr. Langer knew in-house personnel were familiar with the products, instrumentation, and procedures and could appropriately service accounts.

103.    In 2015, Mr. Langer's sales alone accounted for approximately $3.3 million, and the group he co-managed was responsible for more than $13 million in sales for Zimmer.

104.    By the time Zimmer acquired Biomet, Mr. Langer had developed a territory that included over twenty facilities.

III.    **Defendant Forced Its Employee Orthopedic Sales Reps to Become Independent Contractors and Operate Under a New Structure.**

105.    On April 24, 2014, Zimmer announced that it would be merging with Biomet.

106.    On June 24, 2015, Zimmer announced that it had completed its merger with Biomet, and withing a few days the company name changed to Zimmer Biomet Holdings, Inc.

107.    After the merger, Mr. Langer observed a change in company culture and leadership. His place of employment took more Biomet attributes and less of his employer Zimmer.

108.    At the time of the merger or shortly thereafter, several high-level officials left Zimmer, including the President and Chief Executive Officer (David C. Dvorak), the Chief Financial Officer (James T. Crines), the President of Zimmer's Global Reconstructive Division (Jeffery A. McCaulley), and the President of the Americas (Joe Cucolo).

109.    Mr. Langer was aware that before the acquisition, Biomet's sales representatives were independent contractors. This was different than Zimmer, which had designated, paid, and treated its orthopedic sales reps, including Mr. Langer, as employees on a W-2 basis.

110.    Around November 2015, Defendant marketed this new independent contractor arrangement internally as a positive change to its orthopedic sales reps. But the orthopedic sales reps were forced to either agree to the new arrangement or risk termination.

111.    In approximately early November 2015, Defendant presented this new arrangement in many communications including a conference call by sales region (with approximately 150 Zimmer salespeople in attendance), which included a detailed PowerPoint presentation.

112.    On the first slide of the PowerPoint, Defendant assures its salespeople, "Self Employment Not Difficult Just Different." W-2 to 1099, PowerPoint at Slide 1.

113.    Defendant's PowerPoint also informed the orthopedic sales reps that they will be in business for themselves and no longer W2 employees. Defendant listed as "pros" the "[e]lement

of independence" and the right to "[e]mploy your kids" and "[e]mploy your spouse. PowerPoint at Slides 2, 18. This reflected a restructuring of the sales force into much smaller groups of orthopedic sales reps that provided Defendant with much less control over or responsibility for individual workers.

114.    To Mr. Langer, who had worked for years to ensure only qualified sales personnel were servicing the accounts in his territory at Zimmer Rocky Mountain, the idea that independent contractors could hire anyone to do this work—including their children—irrespective of training or technical knowledge, who could then not be held accountable by Defendant was very troubling.

115.    On November 9, 2015, Zimmer sent Mr. Langer and its other orthopedic sales rep employees a "Transition Payment Request Form." The form in bold under the title stated, "Payment Amount $5,000.00 (Gross)" Below that it asked the recipient to mark yes or no with respect to the statement "I have moved to an independent contractor (1099) status." The form made clear which answer would entitle the person to get the money stating, "I understand that to qualify for a Transition Payment, I must have been a W2 employee that became an independent contractor (1099)."

IV.    **Defendant's Sales Associate Agreement Set Forth Its Working Relationship with Independent Orthopedic Sales Reps.**

116.    In November 2015, Defendant provided Mr. Langer and other orthopedic sales reps with a 27-page "Sales Associate Agreement," ("Agreement") water marked "Confidential" on each page. The Agreement had an effective date of January 1, 2016. The Agreement contained a footer that called for the sales reps' initials on each page.

117.    Throughout the Agreement, the orthopedic sales rep is referred to as a "Representative." The term contemplates that a Representative may be a group or company, and it makes clear it in no way involves an employer employee relationship:

<u>Appointment of Representative.</u> Representative and Company acknowledge and agree that, as of the Effective Date, Representative shall be and is hereby engaged as an independent contractor and not as an employee of Company, for the solicitation of sales of Products for the Territory as defined herein. Representative and, if Representative is an entity, each individual executing this Agreement as a Principal Owner (each, a "Principal Owner") shall exercise its best efforts to perform Representative's duties and obligations hereunder, including, but not limited to, the promotion and solicitation of Products in the Territory. Representative agrees and acknowledges that Representative is not a customer of Company. Representative represents and acknowledges that neither this Agreement nor the relationship between Company and Representative creates an employer-employee relationship. Representative is not authorized to transact business or incur any obligations in the name of or for the account of Company, and shall not make any promise, warranty or representation with respect to the Products or any other matter on Company's behalf. Representative will not be deemed to be an agent of Company for any purpose whatsoever, and neither Representative nor any of its agents or employees will have any right or authority to assume or create any obligation of any kind, whether express or implied, on behalf of the Company. This Agreement is not a franchise agreement and does not create a franchise relationship between the parties. If any provision of this Agreement is deemed to create a franchise relationship between the parties, that provision will be deemed null and void and will automatically terminate as if such provision had been deemed unenforceable by a court.

Sales Associate Agreement at 1.

118.    The Agreement includes no base salary at all under "Compensation" it says:

<u>Commissions.</u> Representative shall be paid for the services provided pursuant to this Agreement according to the schedule set forth on Exhibit A, attached hereto and made a part hereof. Subject to the provisions in this Agreement, Commissions shall be deemed earned by Representative upon invoicing of the Products by the Company to the customer. Commission rates may be changed by Company without Representative's approval or consent upon thirty (30) days' written notice to Representative. Commissions earned by Representative shall be computed on the Net Sales which shall be defined as gross sales of the Product(s) sold by Representative, less the items listed in Exhibit B (including, but not limited to, shipping costs, returns, allowances, insurance and taxes which may be reflected on invoices) (collectively "Deduct Items"). Representative understands and agrees that Company may amend or modify the Deduct Items at the beginning of Company's fiscal year upon thirty (30) days' notice to Representative. The commission payments shall be made once monthly to Representative. In the event that a Customer fails to timely pay in full any invoice in compliance with Company's policies and procedures ("Unpaid Invoice"), Company reserves the right to reduce or deduct from a future commission payment to Representative the amount of commission previously paid to Representative on the Unpaid Invoice. These payments and the other consideration identified in this Agreement shall constitute

the sole and complete compensation to Representative by the Company as consideration for the sale of Products within the Territory by Representative during the term of this Agreement.

Sales Associate Agreement at 2.

119.    The Agreement further contemplated "no withholding" and that the Representative would be "solely responsible for any and all expenses" and was "entitled to no benefits." Sales Associate Agreement at 2.

120.    The Agreement included a provision for providing Defendant with notices:

All Notices to Company Shall be provided to Zimmer and Biomet as follows:

Zimmer US, Inc.
Attn: President of Sales
345 East Main Street 16
Warsaw Indiana, 46580

Biomet U.S. Reconstruction, LLC
Attn: President of Sales
345 East Main Street
Warsaw, Indiana 46580

Biomet Biologics, LLC
Attn: President of Sales
345 East Main Street
Warsaw, Indiana 46580

With a copy to:
Zimmer Holdings, LLC
Attn: General Counsel
345 East Main Street
Warsaw, Indiana 46580

Sales Associate Agreement at 15-16.

121.    Defendant's Agreement provided, "All notices to Representative shall be provided as follows:" It then listed "Todd Langer" and left yellow highlighted lines saying, "Click here to enter Street Address" and "Click here to enter City, State and Zip." Sales Associate Agreement at 16.  This was a boilerplate agreement.

122.    Mr. Langer refused to execute the form Sales Associate Agreement provided to him.

**V.    Defendant Compensated Independent Contractors Based on the Volume and Value of Sales.**

123.    Defendant's boilerplate Sales Associate Agreement, which would convert a sales employee to an independent contractor, also contained an exhibit addressing compensation structure. This exhibit made clear that orthopedic sales reps were to be compensated entirely with commissions, necessarily tied strictly to (and in direct proportion with) the volume and value of sales.

124.    The lowest commission percentage contemplated by the compensation structure is 5%. There is a -1% listed, which Mr. Langer understood to include charges against orthopedic equipment for Zimmer-supplied surgical support personnel to be able to advise physicians when such equipment was ordered. The bonus structure appears to require "ADS Growth" or what Mr. Langer understands to mean Average Daily Sales that increase on a quarterly basis over the previous year's quarter.

125.    The compensation structure chart included several columns with information for "Base %" and "Bonus %" and "start date." Mr. Langer was to receive 5% of "Surgical" sales up to 12% for "Trauma" and "Biologics." He was also to receive a "Quarterly Bonus on ADS Growth" also on a percentage basis.

126.    Nowhere in the Compensation Structure Exhibit to the Agreement—or anywhere in the agreement itself that references compensation—is there mention of any base salary or wage payment beyond commissions and bonuses tied to the volume or value of sales.

127.    Defendant's Agreement shows that Defendant contemplated engaging Mr. Langer as an independent contractor and that the only compensation he would receive would be a commission based entirely on the volume or value of sales.

128.    Mr. Langer had been careful to build a group of people who were well versed in technology and product lines from having already worked at Zimmer to being in his sales group. But Defendant's PowerPoint and Sales Associate Agreement contemplated something else. It contemplated much smaller teams of orthopedic sales reps. This structure was intended to absolve Defendant of the actions or inactions of its orthopedic sales reps, who in turn were empowered to hire just about anyone—including even "spouses or kids"—to work on their behalf.

129.    Mr. Langer at this point was well trained and experienced within the industry as were most of the sales personnel involved. "[S]pouses" and "kids" were not necessarily at all involved in learning about medical devices to the extent needed to handle accounts for surgical practices and facilities, which formed the basis of their clientele, but the Defendant's Sales Associate Agreement facilitated the hiring of orthopedic sales reps' spouses and children without ensuring proper qualifications.

**VI.    Defendant Fired Mr. Langer After He Complained that Converting Orthopedic Sales Reps to Independent Contractors Paid Commissions-Only to Sell Medical Devices Violated the Anti-Kickback Statute.**

130.    Mr. Langer wanted to remain a full-time W2 employee, and he made his wishes known within the company.

131.    He also specifically pointed out that the new proposed arrangements could have significant legal ramifications related to the Anti-Kickback Statue.

132.    On or around November of 2015, Mr. Langer confronted Devin Kendall with his concerns about transitioning from being a W-2 employee to an independent contractor. He was told by Mr. Kendall not to talk about his concerns with anyone else.

133.    Mr. Langer nonetheless raised his concerns with other orthopedic sales reps in this territory including Jon Stephens, Kris Vierra, and Andy Fleagle.

134.    On or around November or December of 2015, Mr. Langer also raised concerns with Rob Delp, Defendant's Head of Sales, in person when Mr. Delp was visiting Mr. Langer's territory. Mr. Langer expressed his concern that this new arrangement would be a violation of the Anti-Kickback Statute but was told by Mr. Delp that he did not need to be concerned because what was happening was similar to how Uber—a technology transportation company that did not deal with Government health care—classified and interacted with hits independent contractor drivers. This troubled Mr. Langer.

135.    After Mr. Langer voiced his concerns, Defendant sent a letter to him on November 24, 2015, informing him that Defendant considered his lack of consent to the new independent contractor arrangement to be his "resignation."

136.    Upon receipt, Mr. Langer contacted the Vice President of Human Resources (Robert Abel) stating, "Your Separation letter of 11/24/2015 (copy attached) is quite confusing. I HAVE NOT RESIGNED."

137.    Mr. Langer also complained about being forced to switch from being an employee to independent contractor on several other occasions, including to the Vice President of Human Resources (Robert Abel) on about December 24, 2015.

138.    On or around January 22, 2016, Mr. Langer contacted Zimmer's compliance office, care of compliance officer Nathan Hwang, to voice his concerns. Mr. Langer expressed concern about the independent contractor status for a commission-based position, pointing out that this structure could compromise the legality of such sales, particularly with respect to sales of products that would be reimbursed by government payors.

139.    Mr. Langer specifically referenced the Anti-Kickback Statute and noted that he was "concerned about [his] exposure and that of the other employees who have been forced to become independent contractors." Shortly after, he received word back that Mr. Hwang had been reassigned. Mr. Langer is not aware of anyone ever addressing his concerns, and he never received a substantive response to his concerns.

140.    Defendant failed to respond directly to Mr. Langer's concerns about the conversion from a sales rep employed by the company to an independent contractor or his concerns about how the conversion to an independent contractor would violate the Anti-Kickback Statute.

141.    Defendant continued to designate and treat its orthopedic sales reps as independent contractors.

142.    Defendant's scienter is demonstrated in part by its avoidance and failure to address Mr. Langer's concerns about the new independent contractor arrangement violating the law (specifically the Anti-Kickback Statute) then terminating him after he raised such concerns.

**VII.    Defendant Provided Mr. Langer with Records Showing Commission-Only Sales, but then Failed to Pay Mr. Langer what He Was Owed.**

143.    Although Defendant terminated Mr. Langer following his complaints and refusal to agree to the independent contractor arrangement, it nonetheless sent him the accounting for what he should have been paid.

144.    Defendant provided two sets of invoices, reflecting the sales forms for both Zimmer and Biomet before the forms were merged into one statement.

145.    Zimmer's Sales Detail form for January, February, and March of 2016 also provides sales and commission data for each month.

146.    While Mr. Langer was working and actively gaining business for Zimmer during this time, Defendant was accounting for Mr. Langer's work as if he would be paid commissions.

147.    The March 2016 Zimmer Sales Detail report includes two pages of line-by-line information on each sale attributed to Mr. Langer for sales of $95,457.15, and Defendant was to pay him commissions of $6,962.95, which is a commission of 7.3% for all the items on the list although individual items on the list vary for the commission paid from as low as 3% to as high as 12.5%.

148.    The February report provides similar line by line information regarding total sales of $340,097.12 generating commissions of $25,238.89. (7.4%) The January report provides five pages of detailed information on $452,691.22 of sales and a resulting $27,870.37 (6.15%) in commissions. Zimmer Sales Detail Reports.

149.    The sales detail reports list the invoice number, date, PO number, line product class customer number, customer name, the code for the product and a description, the business segment the sales amount and the commission, on an item-by-item basis. There can be no doubt that pay was strictly tied to the volume and value of sales.

150.    All these documents provide specific information on the Zimmer Biomet products that Mr. Langer was selling up until March 11, 2016, including data for each individual product sold.

151.    These documents also show how and what Defendant was to pay Mr. Langer if he signed the Agreement. In the end, however, he did not sign, and Defendant did not pay him at all.

152.    Mr. Langer was told that because he refused the "valid position" Defendant offered him, he did not qualify to be paid out what he was owed, including his commissions and bonus earned prior to December 31, 2015, and his severance.

**VIII.    Defendant Knew that the Change In Relationship with Its Orthopedic Sales Force Would Violate the Anti-Kickback Statute.**

153.    Defendant acknowledges that it is legally required to comply with the Anti-Kickback Statute. Its 2019 annual report states:

> **If we fail to comply with healthcare fraud and abuse or data privacy and security laws and regulations, we could face substantial penalties and our business, operations and financial condition could be adversely affected.**
>
> …
>
> Our industry is subject to various laws and regulations pertaining to healthcare fraud and abuse, including the False Claims Act, the Anti-Kickback Statute, the Stark law, the Physician Payments Sunshine Act, the Food, Drug, and Cosmetic Act and similar laws and regulations in the U.S. and around the world.
>
> …
>
> Violations of these laws are punishable by criminal and/or civil sanctions, including, in some instances, fines, imprisonment and, within the U.S., exclusion from participation in government healthcare programs, including Medicare, Medicaid and Veterans Administration health programs. These laws are administered by, among others, the DOJ, the OIG-HHS, the SEC, the OFAC, the Bureau of Industry and Security of the U.S. Department of Commerce and state attorneys general.

Annual Report of 2019 at 14 (emphasis as in original).

154.    Defendant also knew that independent contractor sales fleets specifically impose a substantial risk of violating the AKS.

155.    Specifically, Mr. Langer was aware that Zimmer officials knew they legally had to control, supervise, and compensate orthopedic sales reps as common law or statutory W-2 employees (as opposed to 1099 independent contractors) under the Anti-Kickback Statute. They knew this because Zimmer had previously been involved in litigation relating to workers' designations as independent contractors.

156.    In 1999, Zimmer brought an action seeking a declaratory judgment that an agreement it had with an independent contractor (Nu Tech Medical, Inc.) was void because it

violated the Anti-Kickback Statute. *See Zimmer, Inc. v. Nu Tech Med., Inc.*, 54 F. Supp. 2d 850

(N.D. Ind. 1999). Under this agreement, the independent contractor was to receive a

> percentage payment … for marketing and distributing Zimmer's products. The
> percentage and amount of payment [was] to be based on the volume of Zimmer
> products sold. Because Medicare and Medicaid would pay for some of those
> products, the payments to [the independent contractor] would, Zimmer argue[d],
> amount to illegal remuneration for [the independent contractor's] recommending
> or arranging for the purchase of items reimbursable under federal health care
> programs. Zimmer further maintain[ed] that the Agreement [wa]s not protected by
> the safe harbor regulations applicable to the statute.

*Id.* at 854.

157.    To support its case, Zimmer requested an advisory opinion as to the agreement's

legality from the Office of the Inspector General ("OIG") of the Department of Health and Human

Services under 42 U.S.C. § 1320a–7d(b). *Id.* at 852. "The OIG's opinion letter, issued March 19,

1998 as Advisory Opinion 98–1, explained, 'Percentage compensation arrangements are

potentially abusive ... because they provide financial incentives that may encourage overutilization

of items and services and may increase program costs.'" *Id.* at 855.

158.    The OIG also opined that,

> With respect to the Agreement between Zimmer and [the independent contractor],
> the OIG noted three areas of concern about the Agreement, finding that: (1) the
> Agreement contains significant financial incentives to both parties, increasing the
> risk of abusive marketing and billing practices (with specific reference to the
> percentage or volume-based compensation arrangement); (2) the Agreement
> provides opportunities for the parties to unduly influence referral sources and
> patients through active marketing and direct contacts with physicians and Medicare
> patients; and (3) the Agreement includes no safeguards against fraud and abuse, or
> mechanisms to guard against improper payments to physicians to induce them to
> order Zimmer products. The OIG concluded that those areas were sufficiently
> problematic to pose "an unacceptable risk of fraud and abuse so as to preclude a
> favorable advisory opinion."

*Id.* at 855.

159.    Ultimately, the district court held that the agreement—under which the independent contractor received a percentage payment determined by volume and value of products sold—*was* illegal under the Anti-Kickback Statute. *See id.* at 854-55.

160.    Zimmer officials knew that this arrangement was illegal from their previous litigation. Zimmer also knew such an arrangement was illegal under the Anti-Kickback Statute from at least Mr. Langer's expressed concerns. Nonetheless as part of the post-merger structure, Defendant still wanted to avoid the requirements of supervising and paying employees on a W-2 basis and any other responsibility connected with maintaining a full-time employment relationship with such personnel.

161.    Thus, Defendant knowingly and willfully proceeded with converting its Orthopedic sales force from *bona fide* employees to independent contractors, without complying with the AKS safe harbors or seeking an advisory opinion from the HHS OIG. It did so despite the clear illegality because it determined this arrangement would be financially better for Defendant.

**IX.    Since the Acquisition, Defendant Has Paid its Orthopedic Sales Representatives Lofty Commissions and Relinquished Control Over Its Workforce and Defendant Failed to Limit Quotas.**

162.    Defendant successfully converted its orthopedic sales force following the merger and restructured its workforce accordingly.

163.    Several executives and other personnel (including Devin Kendall, Scott Harper, and Orsa Britton) told Mr. Langer during the conversion process that Defendant would make more money with the conversion.

164.    Mr. Langer is also aware of subsequent efforts to restructure orthopedic sales rep teams in a way that would have applied further pressure on independent orthopedic sales reps to increase sales.

165.   Mr. Langer is also aware that Defendant imposed unreasonably high quotas on its independent orthopedic sales reps, applying further pressure on reps to increase sales.

166.   Mr. Langer learned about this change from former colleague Bob Haldeman on May 16, 2022 at the Heart of Rockies Medical Center in Salida Colorado. Mr. Haldeman informed Mr. Langer that Defendant recently had imposed a 150% growth quota. This means that Mr. Halderman would have to increase sales in his territory by that much or lose the territory. The quota was ordered by Todd O'Brien (Vice President of Sales) and John Spears (Territory General Manager), executives at Zimmer Biomet.

167.   Defendant's efforts were indeed intended to increase profits, and Defendant was successful in those efforts. Defendant increased profits in its business in the Americas during the years 2015 and 2016 by 72%, and in the area of knee devices by 41%, and in the area of hip devices by 38%. *See* 2015 Annual Report, Financial Highlights, Zimmer Biomet Holdings, Inc. at 2; 2016 Annual Report, Financial Highlights, Zimmer Biomet Holdings, Inc. at 2.

## X.   Defendant Knowingly Violated the Anti-Kickback Statute and Therefore Caused the Submission of a False Claim in Violation of the False Claims Act.

168.   In converting its orthopedic sales force to a fleet of commission-based independent contractors in control of their own businesses, Defendant relinquished control for ensuring compliance with applicable state and federal laws with respect to orthopedic medical device sales.

169.   In so doing, Defendant sought to limit or eliminate its liability for the actions of its orthopedic sales reps.

170.   Defendant structured its independent orthopedic sales rep workforce in a way that ensured sales reps focused on increasing the volume of sales.

171.   Defendant undertook these efforts with the intent to increase sales and ultimately with the intent to induce its independent sales reps to become more effective at steering providers'

decisions to implant Zimmer Biomet medical devices, including in procedures covered by state and federal health care programs.

172. It did so with a workforce operating on 100% commissioned-based compensation. It did so while knowing that such a structure creates a substantial legal risk.

173. Such compensation arrangements qualify as illegal remuneration, 42 U.S.C. § 1320a-7b(b)(2).

174. Commission payments to non-employees based on the value or volume of products or services are not protected by any safe harbor to the Anti-Kickback Statute. Defendant knowingly left the protection of the only potentially applicable safe harbor when it converted its orthopedic sales reps from W-2 employees into 1099 independent contractors.

175. This scheme violated, and continues to violate, the Anti-Kickback Statute. This scheme necessarily lead to the submission of false claims to the Government.

176. Defendant's illegal kickback scheme taints any and all claims submitted to government payors in connection with procedures using Zimmer Biomet orthopedic medical devices.

177. As a result, Defendant caused false claims to be submitted to and/or paid by United States government programs including, but not limited to Medicare, Medicare Advantage plans, Medicaid, TRICARE, CHAMPVA, and FEHBP.

## CAUSES OF ACTION

### COUNT ONE
### Violations of 31 U.S.C. § 3729(a)(1)(A)
### *Submission of False or Fraudulent Claims*

178. Relator realleges and incorporates by reference all the allegations from the paragraphs above.

179.    This is a claim for treble damages and civil penalties under the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

180.    As set forth above, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States government and any federal health care program (including but not limited to Medicare Advantage plans and states that administer Medicaid programs) in connection with the sale of their orthopedic medical devices.

181.    The False Claims Act defines a "claim" as "any request or demand…for money or property" that "is presented to an officer, employee, or agent of the United States." 31 U.S.C. § 3729(b)(2).

182.    The False Claims Act defines "knowing" and "knowingly" to mean that a person has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). Specific intent is not required. *Id*.

183.    As detailed above, Defendant converted its nationwide sales force of orthopedic sales reps from W-2 employees to independent contractors paid by commissions only for the primary purpose of saving Defendant money.

184.    These commission payments qualify as illegal remuneration.

185.    As a result, such false claims were made to and/or paid by United States government programs including, but not limited to Medicare, Medicaid, TRICARE, CHAMPVA, and FEHBP.

186.    Defendant thereby paid independent contractors to sell orthopedic medical equipment in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a–7b(b)(2), without the safe harbor of having its sales personnel being bona fide employees, 42 U.S.C. § 1320a–7b(b).

187.    Each such payment or solicitation made by Defendant rendered the claims for payment materially "false or fraudulent" under the False Claims Act, under the following theories:

188.    First, as the Anti-Kickback Statute provides:

In addition to the penalties provided for in this section or section 1320a–7a of this title, a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31.

42 U.S.C. § 1320a–7b(g).

189.    Second, Defendant violated the False Claims Act through causing the submissions of a claim or claims wherein a provider falsely certified, expressly and/or impliedly, that the transaction complied with the Anti-Kickback Statute when Defendant is indeed violating the law.

190.    Defendant's practices violate the Anti-Kickback Statute's requirements and run afoul of the safe harbor for volume-based commission agreements by *bona fide* employees. This safe harbor reflects a public policy recognition that true employer-employee arrangements create minimum risk of harming government health care programs because the company can control the sales personnel who are selling medical equipment. The same cannot be said for independent contractor arrangements.

191.    Defendant knowingly violated the requirements of the Anti-Kickback Statute, which is material to the government's decision to pay claims submitted or caused to be submitted by Defendant.

192.    Defendant's activities violate the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), at the expense of government health care programs including but not limited to Medicare, Medicare Advantage plans, Medicaid, TRICARE, CHAMPVA, and FEHBP.

193.    As a result of the Defendants' fraudulent and or illegal conduct, the United States has directly or indirectly paid numerous false claims.

194.    As a direct and proximate result of Defendant's knowingly violating the Anti-Kickback Statute and False Claims Act, Defendant is liable to the United States for three times the amount of damages it has created to the United States as a result of submitting, or causing to submit, these false claims.

195.    Each and every such violation of the Federal False Claims Act is also subject to a civil fine under the False Claims Act of between $5,500-$11,000, for conduct occurring prior to November 2, 2015, and a civil fine of between $11,665 and $23,331, for conduct occurring after November 2, 2015. *See* 81 Fed. Reg. 37004 (June 19, 2020).

196.    In addition, Defendant is liable for any increase as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990.

**COUNT TWO**
**Violations of 31 U.S.C. § 3729(a)(1)(B)**
***False Records or Statements***

197.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

198.    By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted or caused to be submitted for payment or approval—specifically by causing health care providers to submit claims for payment in connection with its orthopedic medical devices and related products that expressly and impliedly certified, and/or made representations, that the transaction complied with the Anti-Kickback Statute, when in fact the transactions were tainted by Defendant's violation of the AKS by entering into agreements with its orthopedic sales representatives as independent contractors paid only a commission based on the volume and value of sales—in violation of 31 U.S.C. § 3729(a)(1)(B).

199.    For purposes of obtaining or aiding to obtain payment or approval of claims from government health care programs, Defendant knowingly made or used, or caused to be made or used, false or fraudulent records or statements.

200.    It was a reasonable and foreseeable that Defendant's actions would render false or fraudulent the claims for payment submitted by its health care provider customers, which claims included certifications and/or representations that the transaction complied with the AKS.

201.    Each false statement in a claim submitted to a government health care program is a separate violation of 31 U.S.C. § 3729(a)(1)(B).

202.    The act of knowingly making, using, or causing to be made or used, false records or statements material to false or fraudulent claims submitted or caused to be submitted for payment or approval renders Defendant liable for statutory penalties, under 31 U.S.C. § 3729(a), in an amount to be determined at trial.

203.    Had the United States actually known of the false or fraudulent nature of the records or statements, it would have been prohibited by law from making corresponding payments.

204.    The United States, however, was unaware of the false nature of the records or statements.

205.    As a result, the United States suffered actual damages in an amount to be determined at trial, and for which Defendant is liable to pay treble actual damages and civil penalties under 31 U.S.C. § 3729(a).

## COUNT THREE
### Violations of 31 U.S.C. § 3729(a)(1)(C)
#### *Conspiracy to Commit Violations of the False Claims Act*

206.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

207. By virtue of the acts described above, Defendant knowingly conspired with independent orthopedic sales reps to submit or cause to be submitted false claims, and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims submitted or caused to be submitted for payment or approval—specifically by conspiring with others to cause health care providers to submit claims for payment in connection with its orthopedic medical devices and related products that expressly and impliedly certified, and/or made representations, that the transaction complied with the Anti-Kickback Statute, when in fact the transactions were tainted by Defendant's violation of the AKS by entering into agreements with orthopedic sales representatives as independent contractors paid only a commission based on the volume and value of sales—in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B).

208. For purposes of obtaining or aiding to obtain payment or approval of claims from government health care programs, Defendant knowingly conspired with independent orthopedic sales representatives, who were not employees or agents of the Defendant, to violate the AKS and 31 U.S.C. §§ 3729(a)(1)(A) and (B), between November of 2015 and the present. Defendant's conspiracy is continuing and ongoing.

209. It was a reasonable and foreseeable that Defendant's conspiracy would render false or fraudulent the claims for payment submitted by its health care provider customers, which claims included certifications and/or representations that the transaction complied with the AKS.

210. Each time the Defendant entered into an agreement with independent sales representatives to pay them only a commission based on the volume and value of sales the Defendant entered into a conspiracy to violate the AKS and the False Claims Act, and each false claim submitted to a government health care program as a result of the conspiracy is a separate violation of 31 U.S.C. § 3729(a)(1)(C).

211.    The act of knowingly conspiring to submit or cause to be submitted false or fraudulent claims submitted to government health care programs renders Defendant liable for statutory penalties, pursuant to 31 U.S.C. § 3729(a), in an amount to be determined at trial.

212.    Had the United States actually known of the Defendant's conspiracy to submit or cause to submit false or fraudulent claims, or the making of false or fraudulent nature of the records or statements, it would have been prohibited by law from making corresponding payments.

213.    The United States, however, was unaware of the Defendant's conspiracy to commit violations of the False Claims Act and AKS.

214.    As a result, the United States suffered actual damages in an amount to be determined at trial, and for which Defendant is liable to pay treble actual damages and civil penalties pursuant to 31 U.S.C. § 3729(a).

**COUNT FOUR**
**Violations of Cal. Gov't Code §§ 12650 et seq.**
***The California False Claims Act***

215.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

216.    This is a claim for treble damages and civil penalties under the Cal. Gov't Code §§ 12650 *et seq.*

217.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

218.    Thereafter, Defendant sold medical equipment paid for by California State entities through sales personnel paid as independent contractors on a commission basis.

219.    As a result, Defendant knowingly presented or caused to be presented false claims to the California Medicaid program (Medi-Cal), knowingly made or caused to be made false

statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct, as well as programs funded by California and its political subdivisions, as defined under the California False Claims Act.

220.   The California Medicaid Program and other programs funded by California and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

221.   By reason of these payments, California has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT FIVE
### Violations of Colo. Rev. Stat. §§ 25.4-4-303.4 et seq.
### *The Colorado False Claims Act*

222.   Relator realleges and incorporates by reference all the allegations from the paragraphs above.

223.   This is an action for treble damages and civil penalties for violations of The Colorado False Claims Act, Colo. Rev. Stat. §§ 25.4-4-303.4 *et seq.*

224.   Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

225.   Thereafter, they sold medical equipment paid for by Colorado State entities through sales personnel paid as independent contractors on a commission basis.

226.   As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage

in the foregoing misconduct relating to the Colorado Medicaid program, as well as programs funded by Colorado and its political subdivisions, as defined under the Colorado False Claims Act.

227.    The Colorado Medicaid Program and other programs funded by Colorado and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

228.    By reason of these payments Colorado has been damaged and continues to be damaged in an amount to be determined at trial.

**COUNT SIX**
**Violations of Conn. Gen. Stat. §§ 17b-301a--17b-301p (2010 Supplement)**
***The Connecticut False Claims Act***

229.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

230.    This is an action for treble damages and civil penalties for violations of the Connecticut False Claims Act, Conn. Gen. Stat. §§ 17b-301a--17b-301p (2010 Supplement).

231.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

232.    Thereafter, they sold medical equipment paid for by Connecticut State entities including political subdivisions through sales personnel paid as independent contractors on a commission basis.

233.    As a result Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Connecticut Medicaid program, and to programs funded by the state of Connecticut as well as its political subdivisions.

41

234.     The Connecticut Medicaid Program and other programs funded by Connecticut and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

235.     By reason of these payments Connecticut has been damaged and continues to be damaged in an amount to be determined at trial.

**COUNT SEVEN**
**Violations of DC Code, §§ 2-381.01 et seq.**
***The District of Columbia False Claims Act***

236.     Relator realleges and incorporates by reference all the allegations from the paragraphs above.

237.     This is an action for treble damages and civil penalties for violations of District of Columbia False Claims Act, DC Code §§ 2-381.01 *et seq.*

238.     Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

239.     As a result Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the District of Columbia's Medicaid program, and to programs paying for health care costs employees of the District of Columbia.

240.     The District of Columbia's Medicaid Program, and any additional program paying for medical devices with District of Columbia funds, were unaware of the falsity or fraudulent nature of these claims. Such claims otherwise would not have been paid.

241.     By reason of these payments the District of Columbia has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT EIGHT
### Violations of Del. Code Ann. Title 6, §§ 1201 et seq.
### *The Delaware False Claims and Reporting Act*

242.    Relator realleges and incorporates by reference all the allegations from the paragraphs above

243.    This is an action for treble damages and civil penalties for violations of Section 1201(a) of the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§ 1201 *et seq.*

244.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

245.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to Delaware's Medicaid program, and to programs funded by the Government of Delaware as defined under the Delaware False Claims and Reporting Act to include all political subdivisions and all Government organizations.

246.    The Delaware Medicaid Program and other programs funded by Delaware and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

247.    By reason of these payments the State of Delaware has been damaged and continues to be damaged in an amount to be determined at trial.

## COUNT NINE
### Violations of Fla. Stat. Ann. § 68.081, et seq.
### *The Florida False Claims Act*

248.    Relator realleges and incorporates by reference all the allegations from the paragraphs above

249.     This is an action for treble damages and civil penalties for violations of The Florida False Claims Act, Fla. Stat. Ann. § 68.081, *et seq.*

250.     Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

251.     As a result, Defendant therefore knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Georgia's Medicaid program.

252.     The Georgia Medicaid Program was unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been allowed.

253.     By reason of these payments the State of Georgia has been damaged and continues to be damaged in a substantial amount to be determined at trial in an amount to be determined at trial.

## COUNT TEN
### Violations of Haw. Rev. Stat. Ann. §§ 661-21 et seq.
### *The Hawaii False Claims Act*

254.     Relator realleges and incorporates by reference all the allegations from the paragraphs above

255.     This is an action for treble damages and civil penalties for violations of the Hawaii False Claims Act, Haw. Rev. Stat. Ann. §§ 661-21 *et seq.*

256.     Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

257.     As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to Hawaii's Medicaid program and to programs funded by Hawaii, and its political subdivisions, to pay health care costs for its employees.

258.     The Hawaii Medicaid Program and other programs funded by Hawaii and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

259.     By reason of these payments the State of Hawaii has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT ELEVEN**
**Violations of 740 Ill. Comp. Stat. Ann. 175/1 et seq.**
***The Illinois False Claims Act***

260.     Relator realleges and incorporates by reference all the allegations from the paragraphs above

261.     This is an action for treble damages and civil penalties for violations of The Illinois False Claims Act, 740 Ill. Comp. Stat. Ann. 175/1 *et seq.*

262.     Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

263.     As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Illinois' Medicaid program, and to programs funded by

the State of Illinois as defined under the Illinois False Claims Act including, but not limited to, political subdivisions and Municipalities.

264.    The Illinois Medicaid Program and other programs funded by Illinois and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

265.    By reason of these payments the State of Illinois has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT TWELVE**
**Violations of Ind. Code §§ 5-11-5.5 et seq.**
***The Indiana False Claims and Whistleblower Protection Act***

266.    Relator realleges and incorporates by reference all the allegations from the paragraphs above

267.    This is an action for treble damages and civil penalties for violations of The Indiana False Claims Act, Ind. Code §§ 5-11-5.5 *et seq.*

268.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

269.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Indiana Medicaid program and to other programs funded by the state of Indiana.

270.    In paying for medical devices and related services with funds from the state of Indiana neither the Indiana Medicaid program nor any additional Indiana program was aware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been paid.

271.    By reason of these payments the State of Indiana has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT THIRTEEN
### Violations of Iowa Code § 685.1 et seq.
#### *The Iowa False Claims Act*

272.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

273.    This is an action for treble damages and civil penalties for violations of The Iowa False Claims Act Iowa Code § 685.1 *et seq.*

274.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

275.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Iowa Medicaid program.

276.    The Iowa Medicaid Program was unaware of the falsity or fraudulent nature of the claims and paid the claims. Such claims otherwise would not have been allowed.

277.    By reason of these payments the State of Iowa has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT FOURTEEN
### Violations of La. Rev. Stat. Ann. §§ 6:438.1 et seq.
#### *The Louisiana Medical Assistance Program Integrity Law*

278.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

279.    This is an action for treble damages and civil penalties for violations of the Louisiana Medical Assistance Program Integrity Law, La. Rev. Stat. Ann. §§ 6:438.1 *et seq.*

280.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

281.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Louisiana Medicaid program.

282.    The Louisiana Medicaid Program, unaware of the falsity or fraudulent nature of the claims and paid for claims. Such claims would otherwise not have been allowed.

283.    By reason of these payments the State of Louisiana has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT FIFTEEN**
**Violations of Md. Code Ann. Health-Gen. §§ 2-601 et seq.**
***The Maryland False Health Claims Act of 2010 and***
**Md. Code Ann. Gen. Prov. §§ 8-101 et seq.**
***The Maryland False Claims Act***

284.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

285.    This is an action for treble damages and civil penalties for violations of the Maryland False Health Claims Act, Md. Code Ann. Health-Gen. §§ 2-601 *et seq.*, and the Maryland False claims Act Md. Code Ann. Gen. Prov. §§ 8-101 *et seq.*

286.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

287.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to Maryland state health plans or programs, the State of Maryland, and Counties of the State of Maryland.

288.    The Maryland state health plans and programs, the State and Counties, were not aware of the falsity or fraudulent nature of the claims, paid these claims. Such claims otherwise would not have been allowed.

289.    By reason of these payments the State of Maryland and Counties have been damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT SIXTEEN
### Violations of Mass. Ann. Laws ch. 12, §§ 5 et seq.
#### *The Massachusetts False Claims Act*

290.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

291.    This is an action for treble damages and civil penalties for violations of the Massachusetts False Claims Act, Mass. Ann. Laws ch. 12, §§ 5 *et seq.*

292.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

293.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Massachusetts Medicaid program, as well as other programs funded by Massachusetts and its political subdivisions.

49

294.    The Massachusetts Medicaid Program and any additional program funded by Massachusetts and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. Those programs paid for claims that otherwise would not have been allowed.

295.    By reason of these payments the Commonwealth of Massachusetts and its political subdivisions have been damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT SEVENTEEN
### Violations of Mich. Comp. Laws. Serv. §§ 400.601 et seq.
### *The Michigan Medicaid False Claims Act*

296.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

297.    This is an action for treble damages and civil penalties for violations of the Michigan Medicaid False Claims Act, Mich. Comp. Laws. Serv. §§ 400.601 *et seq.*

298.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

299.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Michigan Medicaid program and/or the Michigan Department of Community Health.

300.    The Michigan Medicaid Program and Department of Community Health were unaware of the falsity or fraudulent nature of the claims and paid for claims. Such claims otherwise would not have been allowed.

301.     By reason of these payments the State of Michigan has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT EIGHTEEN
## Violations of Minn. Stat. §§ 15C.01 et seq.
### *The Minnesota False Claims Act*

302.     Relator realleges and incorporates by reference all the allegations from the paragraphs above.

303.     This is an action for treble damages and civil penalties for violations of the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*

304.     Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

305.     As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the state of Minnesota, political subdivisions of the State of Minnesota and programs funded by Minnesota and its political subdivisions.

306.     The State of Minnesota and any program funded by Minnesota or its political subdivisions were unaware of the falsity or fraudulent nature of the claims. These programs therefore paid for claims that otherwise would not have been allowed.

307.     By reason of these payments the State of Minnesota and its political subdivisions have been damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT NINETEEN
### Violations of Mont. Code Ann. §§ 17-8-401 et seq.
### *The Montana False Claims Act*

308.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

309.    This is an Action for treble damages and civil penalties for violations of the Montana False Claims Act, Mont. Code Ann. §§ 17-8-401 *et seq.*

310.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

311.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to Montana, and "Government entities" of the State of Montana as defined in the Montana False Claims Act.

312.    The State of Montana and Montana Government entities were unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been allowed.

313.    By reason of these payments the State of Montana and its Government entities have been damaged and continue to be damaged in a substantial amount to be determined at trial.

## COUNT TWENTY
### Violations of Nev. Rev. Stat. Ann. §§357.010 et seq.
### *The Nevada Submission of False Claims to State or Local Government Act*

314.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

315.    This is an action for treble damages and civil fines for violations of the Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. §§ 357.010 *et seq.*

316.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

317.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the state of Nevada, as well as programs funded by Nevada and its Political Subdivisions as defined under the Nevada False Claims to State and Local Government Act.

318.    The state of Nevada and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been allowed.

319.    By reason of these payments the State of Nevada and its political subdivisions have been damaged and continue to be damaged in a substantial amount to be determined at trial.

**COUNT TWENTY-ONE**
**Violations of N.J. Stat. Ann. § 2A:32C-1 et seq.**
*The New Jersey False Claims Act*

320.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

321.    This is an action for treble damages and civil fines under Section 2A:32C-3 of the New Jersey False Claims Act, N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*

322.   Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

323.   As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the State of New Jersey and programs funded by the State of New Jersey as "State" is defined under the New Jersey False Claims Act.

324.   The State of New Jersey and programs funded by the State of New Jersey were unaware of the falsity or fraudulent nature of the claims. Such claims otherwise would not have been allowed.

325.   By reason of these payments the State of New Jersey has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT TWENTY-TWO**
**Violations of N.M. Stat. Ann. §§ 27-14-1 et seq.**
***The New Mexico Medicaid False Claims Act and***
**N.M. Stat. Ann. §§ 44-9-1 et seq.**
***The New Mexico Fraud Against Taxpayers Act***

326.   Relator realleges and incorporates by reference all the allegations from the paragraphs above.

327.   This is an action for treble damages and civil fines under The New Mexico Medicaid False Claims Act and New Mexico Fraud Against Taxpayers Act N.M. Stat. Ann. §§ 27-14-1 *et seq.*

328.   Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

329.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the New Mexico Medicaid program, as well as programs funded by The State of New Mexico as defined under the New Mexico Fraud Against Taxpayers Act.

330.    The New Mexico Medicaid Program and other programs funded by the State of New Mexico were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

331.    By reason of these payments the State of New Mexico has been damaged and continues to be damaged in a substantial amount to be determined at trial.

### COUNT TWENTY-THREE
### Violations of N.Y. State Fin. Law §§ 188 et seq.
### *The New York False Claims Act*

332.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

333.    This is an action for treble damages and civil fines under the New York False Claims Act. N.Y. State Fin. Law §§ 188 *et seq.*

334.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

335.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the New York Medicaid program, as well as programs

funded by the State of New York and programs funded by Local Governments of the State as defined under the New York False Claims Act.

336. The New York Medicaid Program and other programs funded by New York State and New York Local Governments were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

337. By reason of these payments the State of New York and Local Governments have been damaged and continue to be damaged in a substantial amount to be determined at trial.

**COUNT TWENTY-FOUR**
**Violations of N.C. Gen. Stat. §§ 1-605 et seq.**
***The North Carolina False Claims Act***

338. Relator realleges and incorporates by reference all the allegations from the paragraphs above.

339. This is an action for treble damages and civil fines against Defendant under the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*

340. Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

341. As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to North Carolina and programs funded by the State of North Carolina.

342. The State of North Carolina and programs funded by the State of North Carolina were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

343.    By reason of these payments the State of North Carolina has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT TWENTY-FIVE
### Violations of Okla. Stat. tit. 63, §§ 5053 et seq.
### *The Oklahoma Medicaid False Claims Act*

344.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

345.    This is an action for treble damages and civil fines against Defendant under the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§ 5053 *et seq.*

346.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

347.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to Oklahoma and programs funded by the State of Oklahoma.

348.    The State of Oklahoma and programs funded by the State of Oklahoma were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

349.    By reason of these payments the State of Oklahoma has been damaged and continues to be damaged in a substantial amount to be determined at trial.

## COUNT TWENTY-SIX
### Violations of R.I. Gen. Laws §§ 9-1.1-1 et seq.
### *The Rhode Island False Claims Act*

350.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

351.    This is an action for treble damages and civil fines against Defendant under the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*

352.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

353.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the State of Rhode, as well as programs funded by the State of Rhode Island as defined under the Rhode Island False Claims Act to include all Rhode Island agencies, government entities, cities, towns.

354.    The State of Rhode Island and programs funded by the State of Rhode Island were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

355.    By reason of these payments the State of Rhode Island has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT TWENTY-SEVEN**
**Violations of T.C.A. §§ 4-18-101 et seq.**
***The Tennessee False Claims Act***
**and T.C.A. §§ 71-5-181 et seq.**
***and Tennessee Medicaid False Claims Act***

356.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

357.    This is an action for treble damages and civil fines against the Defendant under T.C.A §§ 4-18-101 *et seq.*, the Tennessee False Claims Act and T.C.A. §§ 71-5-181 *et seq.* the Tennessee Medicaid False Claims Act.

358.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

359.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Tennessee Medicaid program, as well as programs funded by Tennessee and its political subdivisions as defined under the Tennessee False Claims Act and the Tennessee Medicaid False Claims Act.

360.    The Tennessee Medicaid Program and other programs funded by Tennessee and its political subdivisions were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

361.    By reason of these payments the State of Tennessee and its political subdivisions have been damaged and continue to be damaged in a substantial amount to be determined at trial.

**COUNT TWENTY-EIGHT**
**Violations of Tex. Hum. Res. Code Ann. §§ 36.001 et seq.**
***The Texas Medicaid Fraud Prevention Act***

362.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

363.    This is an action for treble damages and civil fines against Defendant under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*

364.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

365. As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Texas Medicaid program.

366. The Texas Medicaid Program was unaware of the falsity or fraudulent nature of the claims. Texas therefore paid for claims that otherwise would not have been allowed.

367. By reason of these payments the State of Texas has been damaged and continues to be damaged in a substantial amount to be determined at trial.

**COUNT TWENTY-NINE**
**Violations of 32 VSA §§ 630 et seq.**
***The Vermont False Claims Act***

368. Relator realleges and incorporates by reference all the allegations from the paragraphs above.

369. Mr. Langer seeks relief against Defendant under the Vermont False Claims Act, 32 VSA §§ 630 *et seq.*

370. Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

371. As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Vermont Medicaid program, as well as programs funded by the State of Vermont as defined under the Vermont False Claims Act to include, any agency of state government, and any political subdivision.

372.    The Vermont Medicaid Program and other Vermont programs were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

373.    By reason of these payments the State of Vermont and its political subdivisions have been damaged and continue to be damaged in a substantial amount to be determined at trial.

**COUNT THIRTY**
**Violations of Va. Code Ann. §§ 8.01-216.1 et seq.**
***The Virginia Fraud Against Taxpayers Act***

374.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

375.    Mr. Langer seeks relief against Defendant under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§ 8.01-216.1 *et seq.*

376.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

377.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Virginia Medicaid program, as well as programs funded by the Commonwealth of Virginia as defined under the Virginia Fraud Against Taxpayers Act to include, any agency of state government, and any political subdivision.

378.    The Virginia Medicaid Program and other Commonwealth of Virginia programs were unaware of the falsity or fraudulent nature of the claims. They therefore paid for claims that otherwise would not have been allowed.

379.    By reason of these payments the Commonwealth of Virginia has been damaged and continues to be damaged in a substantial amount to be determined at trial.

### COUNT THIRTY-ONE
### Violations of RCW 74.66.005 et seq.
### *The Washington Medicaid Fraud Act*

380.    Relator realleges and incorporates by reference all the allegations from the paragraphs above.

381.    This is an action for treble damages and civil fines against the Defendant under the Washington Medicaid Fraud Act RCW 74.66.005 *et seq.*

382.    Defendant engaged in a scheme to change its sales force to be independent contractors and sell products through such personnel on a commission only basis in knowing violation of the Anti-Kickback Statute.

383.    As a result, Defendant knowingly presented or caused to be presented false claims, knowingly made or caused to be made false statements or records material to false or fraudulent claims, and engaged in a conspiracy with independent orthopedic sales representatives to engage in the foregoing misconduct relating to the Washington Medicaid program.

384.    The State of Washington was unaware of the falsity or fraudulent nature of the claims. The State therefore paid for claims that otherwise would not have been allowed.

385.    By reason of these payments the State of Washington has been damaged and continues to be damaged in a substantial amount to be determined at trial.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff-Relator Mr. Langer, on behalf of himself, the United States, and all States listed herein, request that judgment be entered in his favor and against Defendant as follows:

(A)    Judgment that Defendant violated the False Claims Act and the State False Claims Act;

(B)    Judgment that Defendant cease and desist from violating 31 U.S.C. § 3729, *et seq*., and the counterpart provisions of the State False Claims Acts;

(C)    An award in an amount equal to three times the amount of damages the United States and each of the States has sustained because of Defendant's actions;

(D)    Civil penalties of not less than $5,000 and not more than $11,000 as adjusted by statute for each claim in violation of 31 U.S.C. § 3729 occurring prior to November 2, 2015; a civil fine of between $11,665 and $23,331, for such conduct occurring after November 2, 2015*, see* 81 Fed. Reg. 42491 (June 19, 2020); and any other increase in civil fines as specified by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus the appropriate amount to the States for damages and civil fines as determined under the State False Claims Acts;

(E)    An award to Mr. Langer for the maximum amount allowed under §3730(d) of the False Claims Act and the maximum amount allowed under the State False Claims Act statutes;

(F)    An award to Mr. Langer in an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of any award or settlement;

(G)    An award to Mr. Langer in an amount that the Court decides is reasonable, which shall not be less than 15% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of

any equitable relief, fines, restitution, or disgorgement to the United States and/or

third parties;

(H)    An award to Mr. Langer, be awarded all costs of this action,

including attorneys' fees, expenses, and costs under 31 U.S.C. §§ 3730(d) and

similar provisions of the State False Claims Acts listed herein;

(I)    That Mr. Langer be granted a jury trial;

(J)    That Mr. Langer, the United States, and the States listed herein be

awarded pre-judgment interest; and

(K)    Such relief to Mr. Langer, the United States, and the States listed

herein as the Court deems just and proper.

## **JURY TRIAL DEMANDED**

386.    Mr. Langer hereby demands a jury trial on the causes of action alleged herein.

Respectfully Submitted,

Dated: April 10, 2025                    NICHOLS KASTER, PLLP

/s/Rebekah L. Bailey
Rebekah L. Bailey*
MN Bar No. 0389599
Mathew H. Morgan*
MN Bar No. 0304657
Grace I. Chanin*
MN Bar No. 399969
Nichols Kaster, PLLP
4700 IDS Center
80 S. Eighth Street
Minneapolis, MN 55402
Tel: 612.256.3200
Fax: 612.338.4878
bailey@nka.com
morgan@nka.com
gchanin@nka.com
*Admitted *Pro Hac Vice*

KOHN, KOHN & COLAPINTO, LLP

/s/David K. Colapinto
David K. Colapinto
BBO # 551835
1710 P. Street, N.W.
Washington, D.C.  20036
Email:  dc@kkc.com
Phone:  202-342-6980
Fax:     202-342-6984

PRICE BENOWITZ, LLP

/s/Anthony C. Munter
Anthony C. Munter
BBO #600016
409 7th Street, N.W.
Washington, DC 20004
Email: tony@pricebenowitz.com
Phone: 202-417-6000
Fax:     202-664-1331

Attorneys for Plaintiff-Relator Todd Langer

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on April 10, 2025.

<u>/s/Rebekah L. Bailey</u>
Rebekah L. Bailey
MN Bar No. 0389599